**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ex. rel., CHARLES REHBERG, JOHN BAGNATO, M.D. and ALAN MOREE | ) ) ) Civil Action No.: 1:04-CV-162 (WLS) |
| Relators/Quitam Plaintiffs, | ) ) ) |
| vs. | ) ) |
| PHOEBE PUTNEY HEALTH SYSTEMS, INC.; PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.; LAMAR MOREE, M.D.; ALBANY ANESTHESIA, JOHN DOES 1 THROUGH 100, | ) **TO BE FILED IN CAMERA** ) **AND UNDER SEAL** ) ) |
| Defendants. | ) ) ) |

**FIRST AMENDED QUITAM RELATOR COMPLAINT**
**UNDER 31 U.S.C. § 3729, FEDERAL FALSE CLAIMS ACT**

Come Now Relators, Charles Rehberg, John Bagnato, M.D., and Alan Moree, by and through their counsel of record, and for this cause of action against the Defendants Phoebe Putney Health Systems, Inc., Phoebe Putney Memorial Hospital, Inc. (collectively referred to as "Phoebe"), Lamar Moree, M.D., and Albany Anesthesia and state to the Court as follows:

1.

This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false claims presented for payment by Defendants under the Federal Medicare Program. This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the

United States District Courts shall have exclusive jurisdiction of actions brought under that Act.

2.

Section 3732(a) of the Act provides that "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

3.

The Court has subject matter jurisdiction in entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because at least one of the defendants resides or transacts business in the Middle District of Georgia.

4.

Venue is proper in the Middle District of Georgia under 31 U.S.C. §3732 and 28 U.S.C. § 1391(b) and (c) because Defendants reside or transact business in that District.

5.

Alan Moree is former Assistant Vice President of Finance at Phoebe Putney Memorial Hospital. In the course of his working relationship with Phoebe Putney, Relator Alan Moree learned that certain management decisions of the health systems facilities were contrary to the statutory and ethical dictates found in federal and state law. The specific information know to Mr. Moree implicates the need for a thorough criminal and civil investigation into Phoebe Putney.

2

6.

Relator John Bagnato, MD, is a surgeon and resident of Albany, Georgia, and is a physician and surgeon practicing at defendant hospital.  Dr. Bagnato has consistently attempted to convince Phoebe Putney to institute corporate safeguards regarding conflicts of interests at the institution, and has been active and vocal in opposing policies, procedures, and practices that he believes are contrary to good medicine and against the best interests of his patients.

Relator Charles Rehberg is a certified public account, certified forensic accountant, and has experience both auditing hospitals for compliance with Medicare statutory and regulatory compliance as well as working as a Chief Financial Officer for rural community hospitals in Georgia.  Relators are well known in the community, particularly among physicians, health care workers, and employees of Phoebe Putney Hospital, as individuals who oppose fraudulent and corrupt practices in health care.

6A.

**The False Claim Act**

The False Clams Act ("FCA") provides in pertinent part:

> (a) Any person who (1) knowingly presents or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Force of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . or (7) knowingly makes, uses, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

* * *

3

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

7.

**The Medicare Program**

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is barred on age, disability or affliction with end-stage renal diseases. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals including Phoebe derive a substantial portion of their revenue from the Medicare Program.

8.

HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

9.

Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider

4

agreements with hospitals in order to establish the hospitals' eligibility for participating in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

10.

As detailed below, Phoebe submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

11.

To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. §1395h. Fiscal immediacies, typically insurance companies, are responsible for processing and paying claims and auditing cost reports. At all times relevant herein, the fiscal intermediary to which Phoebe submitted Medicare claims was Blue Cross Blue Shield of Georgia.

12.

Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS From UB-92 (formerly called a HCFA Form UB-92).

13.

As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually form CMS-2552 (formerly called a HCFA-2552), more commonly known as the

Hospital Cost Report.  Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

14.

After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believe it is due for the year.  *See* 42 U.S.C. §1395g(a); 42 C.F.R. §413.20.  *See also* C.F.R. § 405.1801(b)(1).  Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

15.

Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year.  On the Hospital Cost Report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare Program or the amount due to the provider.

16.

Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by PHOEBE to ensure their accuracy and preserve the

6

integrity of the Medicare Trust Funds. That right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. §413.64(f).

17.

Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

18.

At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

19.

In or about 1996, the Hospital Cost Report was revised to include the following notice:

> Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

7

20.

Phoebe is and was at all relevant times familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

21.

A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

22.

Hospital Cost Reports submitted by Phoebe were, at all times relevant to this Complaint, signed by Phoebe employees who attested, among other things, to the certification quoted above.

23.

**The Medicaid Program**

Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily this poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

24.

The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FPF"), 42 U.S.C. §§ 1396, *et seq.*

25.

Each state's Medicaid program must cover hospital services.   42 U.S.C. §1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

26.

Georgia provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid fiscal intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Provider hospitals participating in the Medicaid program file a copy of their Medicare cost reports with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.

27.

At all material times, the Medicaid Program was administered in the State of Georgia by the Office of the Governor, State of Georgia, Medicaid Division ("Georgia Medicaid"), which contracted with Blue Cross Blue Shield of Georgia to serve as paying agent to receive, adjudicate, and pay Medicaid claims submitted by Medicaid participating providers in the State of Georgia. Providers incorporate the same type of financial data in their Medicare cost reports as contained in their Medicaid cost reports, and include data concerning the number of Medicaid patient days at a given facility.

28.

The Georgia Medicaid program uses the Medicaid patient data in the cost report

9

to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

29.

Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

30.

Phoebe sought reimbursement from the Georgia Medicaid program for the time period pertinent to this Complaint.

31.

Most health care providers which have entered into provider agreements with the Secretary, as has the Hospital, are reimbursed through the Prospective Payment System (PPS). This system reimburses hospitals not for their actual incurred costs but for costs based on prospectively fixed rates for each category of treatment.

32.

Hospitals receive payment for the services they perform on Medicare beneficiaries based upon the "diagnosis related group" (DRG) within which the service falls. 42 C.F.R. § 412.60 (2001). The payment rates for the upcoming federal fiscal year (FFY) for each DRG are published in the Federal Register, first in the form of a proposed rule and then in the form of a final rule published on or about August 1 for the FFY beginning on October 1 of that year. 42 U.S.C. § 1395ww(d)(6); 42 C.F.R. §412.8. This system notifies hospitals in advance of the amount of payment they should expect to

receive per patient for each DRG.

33.

In order to account for wide variations in the cost of labor across the country, the amount of a hospital's payment under the PPS will vary depending on its location. First, hospitals are assigned a standardized rate based on whether they are located in a country in a "large urban," urban," or "rural" area. *See Athens Cmty. Hosp., Inc. v. Shalala,* 305 U.S. App. D.C. 428, 21 F.3d 1176, 1177 (D.C. Cir. 1994). A wage area in a "large urban" or "urban" location is known as a Metropolitan Statistical Area (MSA). After calculating the standardized rate based on the area, the hospital's payment rates are computed by adjusting the standardized amount by a "wage index" to account for area wage differences. 42 U.S.C. § 1395ww(d)(3)(E).

34.

The wage index is updated each year based on hourly wage data collected from the hospitals. Each hospital provides the Secretary with date including the total salaries paid to and hours worked by its employees. §1395ww(d)(3)(E). The Secretary computes the average hourly wage for a labor market area by adding the total of the salaries and fringe benefits paid by the hospitals within that area, and dividing that figures by the total number of hours worked. Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47,054, 47,074-76 (Aug. 1, 2000) (to be codified at 42 C.F.R. pts 410, 412, 413 & 485).

35.

The Secretary uses this data to create the wage index for each geographic area. The wage index compares the average hourly wage for hospitals in a given geographic

11

area with the national average hourly wage, which in turn determines the payment rate above or below the national average at which a hospital is reimbursed. The wage index for an area generally applies to all hospitals physically located within that geographic area.

36.

Thus, the wage index has a significant effect on the amount of reimbursement a hospital receives.

37.

Medicare statutes contain a complex formula for calculating prospective payment rates. The rates are derived by first calculating the average Medicare allowable costs per discharge during a base year, adjusted for inflation, for each hospital participating in the Medicare program. 42 U.S.C. §1395ww(d)(2)(A)(B). Adjusted averages for each hospital are then "standardized" to remove the effects of factors including indirect medical costs, wage variations, and "case mix" (that is, the relative complexity and costlines of each hospital's cases). 42 U.S.C. §1395ww(d)(2)(C).

38.

A hospital's payment under PPS varies in part based on its geographic classification, in particular on whether the hospital is located or deemed to be located within an urban or rural area. 42 U.S.C. §1395ww(d)(2)(D). An urban area is defined as a Metropolitan Statistical Area ("MSA") or certain other specified localities. 42 U.S.C. §1395ww(d)(2)(D); 42 C.F.R. §412.62(f). Any other area is defined as a rural area. *Id*. The statute requires the Secretary to compute a separate average of hospital "standardized amounts" for rural and urban areas. 42 U.S.C. §1395ww(d)(2)(D). In addition, in

12

making payments to particular hospitals, actual PPS payment rates for each DRG are computed by adjusting the appropriate standardized amount by a "wage index" to account for area wage differences. The wage index which reflects the relative level of wages and salaries for hospital workers in the area where the hospital is located compared to the national average hospital wage level 42 U.S.C. §1395ww(d)(3)(E).

39.

The Secretary determines a separate wage index for each MSA in the United States, and one wage index per state for rural counties and towns not located in an MSA. The wage index used to adjust Medicare inpatient service payments for an individual hospital is the wage index that the Secretary determines and assigns to the area in which the hospital is physically located. The Secretary recalculates and revises the wage indices annually. This wage index is intended to compensate for regional differences in the costs of providing services of §1895ww(d)(3)(E); 42 C.F.R. Part 412.62. Generally, under PPS urban hospitals receive a higher reimbursement than rural hospitals.

40.

Under PPS, Medicare authorities first construct a standard nationwide cost rate— the "federal rate" – based on the average operating costs of inpatient hospital services. *See* 49 Fed. Reg. 234, 251 (Jan. 3, 1984). They then assign a weight to each category of inpatient treatment, or "diagnosis-related group" ("DRG"). Finally, they calculate a "wage index" to adjust reimbursement rates to reflect regional variations in hospital wage costs. For each patient discharge, a hospital's final reimbursement is calculated by taking the federal rate, adjusting it for wage variations, and multiplying it by the weight assigned to the patient's DRG. *See generally* 42 U.S.C. §1395ww(d)(2)(1988).

13

41.

The wage index reflects a requirement in the 1983 Amendments that the federal rate be adjusted to reflect geographic variations in labor costs. *See* 42 U.S.C. §1395ww(d)(2)(H). The area wage indexes for each region are based on wage-cost data periodically submitted by Medicare hospitals across the country. The indexes are used at two points in the prospective payment rate calculation. First, regional wage indexes are used (along with other factors, such as inflation and hospital case-mix ratios) to modify and standardize the data used to establish the nationwide "federal rate." *See* 42 U.S.C. §1395ww(d)(2)(H). Because each wage index is used to develop the base national rate as well as to adjust that rate by region, a change in any single wage index can affect the reimbursement rate of each hospital in the country.

42.

Using a complex formula, the Secretary computes the PPS payment rate for a particular provider on the basis of information in a wage index. The wage index reflects "the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. §1395ww(d)(2)(H). The wage index for a hospital is calculated by dividing "the average hourly wage paid by hospitals in that area by the national average hourly hospital wage." Once calculated, the wage index is used to help determine the amount of reimbursement that each provider is entitled to receive under the PPS. Under this formula, the higher the wage index for the area in which the hospital is located, the more reimbursement the hospital will receive per discharge.

14

43.

The data used to calculate the wage index is collected directly from the providers by means of a "hospital wage survey" which is conducted by the Health Care Financing Administration ("HCFA"). Every year, the HCFA updates the data that it collects from the providers on the basis of the information in Worksheet S-3, Part II of the provider's cost reports. 42 U.S.C. §1395ww(d)(3)(E). Based on the substantial amount of time that is needed for the provider to compile and submit the cost reports, and for the intermediary to then review these reports, there is generally a four year lag between the date upon which the provider reports the wage data and the date when the wage index is published.

44.

The Office of Inspector General released its work plan for FY 2005 which raises concerns about the accuracy of hospital wage data. Below is a excerpt from the plan related to their perceived review data reporting for wage indexes.

**Inpatient Prospective Payment System Wage Indices**

We will determine whether hospital and Medicare controls are adequate to ensure the accuracy of the hospital wage data used for calculating wage indices for the inpatient prospective payment system. We believe that the wage indices are vulnerable to inaccuracy because the data used to calculate them for many metropolitan statistical areas are significantly influenced by information reported by a single hospital. Consequently, a hospital that reports incorrect wage data through its Medicare cost report could receive incorrect DRG reimbursement. We will determine the effect on the Medicare program in terms of incorrect DRG reimbursement.

*(OAS; W-00-04-35100; various reviews; expected issue date: FY 2005; work in progress)*

This case confirms the concerns of the Inspector General.

15

45.

Mr. Alan Moree worked for nine years at Phoebe Putney Memorial Hospital. He served as Assistant Vice President of Finance between 1995 and 2004. Mr. Moree worked directly under Phoebe Putney's Chief Financial Officer, Kerry Loudermilk. Mr. Moree was terminated on or about May, 15, 2004.

46.

Mr. Moree's termination came about after he refused to study the Medicare patient population and determine how Phoebe Putney could set its pricing to manipulate reimbursement for cost outliers. He was instructed to do that verbally by Kerry Loudermilk. After he was instructed to do this, Mr. Moree told Mr. Loudermilk that he believed that such manipulation was exactly the thing that got Tenet Healthsystems in trouble, and Mr. Moree refused to do that. After that disagreement, Mr. Loudermilk became unjustifiably critical of Mr. Moree's work performance. Mr. Moree later approached Mr. Loudermilk, suggested that Mr. Moree would resign in view of his disagreements with Mr. Loudermilk. Within about 24 hours, Mr. Moree was sitting in the office of the Vice President of Human Resources, Dave Baranski, and working out the terms of his severance agreement.

47.

The severance agreement contains a six month pay provision as well as a confidentiality provision. This confidentiality provision, to the extent that it requires Mr. Moree to conceal fraud, false claims or illegal conduct by Phoebe Putney, is not enforceable.

48.

In the first quarter of 2004, Mr. Loudermilk instructed Mr. Moree to study the Medicare patient population and determine how the hospital could manipulate its pricing so as to take advantage of cost outliers. Cost outliers are outliers which are created as result of exceptional charges for certain types of procedures.

49.

At the time that this was being done, Tenet Healthsystem was in the news for having done exactly the same thing. The Office of the Inspector General of Health and Human Services (HHSOIG) had indicated that they would examine any hospital whose cost outliers were greater than 10%. At the time, the cost outliers at Phoebe Putney Memorial Hospital were 4.25%. Mr. Loudermilk said that "the OIG has given us a target, I want you to move it to 9%." The idea was to game the system and manipulate charges to generate greater outlier payments. Mr. Moree did not believe this was lawful, and as a result he refused to do it. Sometime after Mr. Moree's departure in May 2004, on information in belief, he believes that Phoebe Putney instituted the study necessary to set the prices so as to obtain increasing outliers.

50.

In Georgia, hospitals are required to file a hospital financial survey. It is used to determine the hospital's compensation from the Indigent Care Trust Fund. A hospital states in its report the amount of indigent care that it provides to charity patients. The Georgia Department of Community Health then takes that information and, using federal funds, pays out to the hospitals the amount of money equivalent to a calculated percentage of their charity care.

17

51.

The purpose of the federal Disproportionate Share Hospital (DSH) Program and Georgia's Indigent Care Trust Fund (ICTF) is to provide compensation to qualifying hospitals for services provided without charge or for a reduced charge to Medicaid and medically indigent patients. Two additional purposes of the ICTF are to provide primary health care programs for the medically indigent citizens and children of Georgia, and to expand Medicaid eligibility and services.

52.

In 1981 federal legislation established the DSH Program. The Georgia General Assembly created the ICTF in 1990, which serves as the conduit for funds between the federal DSH Program and Georgia hospitals. The Georgia Department of Community Health's (DCH) Division of Medical Assistance administers the ICTF.

53.

Medically indigent patients qualify to receive hospital services without charge or at a reduced charge at ICTF hospitals. Patients with incomes below 200% of the federal poverty guidelines published by the United States Department of Health and Human Services are defined as medically indigent by the rules of the ICTF. Patients with incomes below 125% of the federal poverty guidelines receive hospital services without charge. As of September 3, 2000, patients with income between 125% and 200% of the federal poverty guidelines receive hospital services at a reduced charge. Prior to September 3rd, the range was 125% to 185% of the federal poverty guidelines.

18

54.

According to the rules of the ICTF, hospitals with remaining ICTF funds must provide services to medically indigent patients without charge or a reduced charge. It should be noted that ICTF hospitals may continue to serve medically indigent patients even after the ICTF funds are spent. The services patients receive without charge or at a reduced charge are hospital services and do not include fees charges by physicians who are not on the staff of the hospital. These non-hospital staff physician fees are the responsibility of the patient and may be covered through a third party payer such as Medicaid, Medicare, or private insurance.

55.

In general, the hospitals that receive ICTF funds are hospitals that serve a higher than average number of Medicaid and other low-income patients. To qualify for ICTF funds, hospitals must meet two federal criteria and one of nine state criteria. The federal criteria deal with the availability of obstetrician services to Medicaid recipients ad the percentage of a hospital's patients that receive Medicaid payments. The nine state criteria include qualifying factors such as: the percentage of a hospital's patients that are Medicaid recipients or low-income patients, children's hospitals, state teaching hospitals, and small rural hospitals.

56.

The Disproportionate Share Hospital program is a federal program that aims to increase health care access for the poor. Hospitals that treat a "disproportionate" number of Medicaid and other indigent patients qualify to receive DSH payments through the

19

Medicaid program based on the hospitals' estimated uncompensated cost of services to the uninsured.

57.

The ICTF represents the largest component of DSH payments distributed through Georgia Medicaid. To participate in ICTF, a hospital must also be a DSH provider. With ICTF funding, even uninsured people who do not qualify for Medicaid may receive health care from participating hospitals.

58.

To qualify for DSH, a hospital must satisfy both Federal criteria AND at least one of the state criteria.

**Federal criteria**
1. Provide non-emergency obstetrical services to Medicaid recipients (if those services were provided on December 22, 1987)
2. Have a Medicaid inpatient utilization rate of at least 1%

**State criteria**
1. Inpatient utilization rate greater than the mean rate plus one standard deviation
2. Low-income inpatient utilization rate greater than 25%
3. Medicaid charges greater than 15 of total charges
4. Hospitals with the largest number of admissions in its area
5. Children's hospital
6. Hospital designated as a regional perinatal center
7. Hospital designated a Medicare rural referral center and a Medicare DSH provider
8. State-owned and operated teaching hospital
9. A small, rural public hospital with a Medicaid inpatient utilization rate of at least 1%

59.

Georgia Medicaid also requires each hospital to prepare and receive approval of a plan outlining specific spending proposals for 15% of its ICTF funding in primary care

programs. Five percent of that amount may be spent on capital costs, such as building a primary care center at the participating hospital.

60.

ICTF is funded through voluntary intergovernmental transfers or contributions from participating public hospitals and other government entities, and matching federal funds. The federal-to-hospital contributions match is approximately 60:40 for benefit expenditures and 50:50 for administrative expenditures. No money from Georgia's general fund is used. Using a formula based on information about the hospitals' estimated uncompensated care, the Division of Medical Assistance determines the payment amount each hospital is eligible to receive and annually distributes ICTF funds to those hospitals.

61.

Under the instruction of Mr. Loudermilk, Phoebe Putney manipulated and submitted false claims to the Indigent Care Trust Fund. The information to generate the hospital financial survey cuts off at the fiscal year end on July 31st of every year. As of July 31st, the amount of indigent and charity care is reasonably is well known. However, it was the instruction of Mr. Loudermilk that the information necessary to file charity care would not be compiled until a few days before the report was due in late December of each year. In late December when it became necessary to file this report, Mr. Loudermilk instructed his staff to add to the report figures of any and all hospital charges which had not been reimbursed from July to December, for dates of service through the fiscal year ending July 31. This manipulation of all hospital charges would not only include the patient who had insurance or claimed to have insurance and was then found

21

not to, but it would also encompass those patients for whom a bill had simply not been paid by insurance or who had been audited by insurance and the payment had not yet been received.

62.

Mr. Loudermilk instructed Mr. Moree to obtain a patient population report that showed all patients with any charges which had not been reimbursed as of December 10 for dates of service through July 31. This manipulation boosted the submitted amount of "indigent" and "charity care" substantially, and increased by millions of dollars the amount collected by Phoebe from the Indigent Care Trust Fund. All of this was done through billing system. However, there was no real paper trail back to Mr. Loudermilk. Ms. Lyla Chammoun ran the report and provided the information.

63.

However, in the meeting wherein Mr. Loudermilk decided to use this approach, there were other people present. In addition to Ms. Chammoun, there was Virginia Sizemore, who is now with ABC Bank Corp. (she left Phoebe Putney Memorial Hospital on or about 12-10-04). Ms. Sizemore was the Manager of Decision Support, and she was present. Jeff Head was the Manager of Revenue, and he was present in the meeting room. In addition, Mr. Moree and Ms. Chammoun were present.

64.

Phoebe Putney also created Grove Point Indemnity, an off-shore self-insurance funds set up in the Cayman Islands with roughly $11 million dollars. The board and hospital executives routinely flew down to the Cayman Islands in order to "visit the money" that they placed on deposit there. The purported reason for using the Cayman

Islands as a venue for setting up the company was that it allowed them to get into the international re-insurance market and had much better tax implications.

65.

The tax implications are significant. In a corporation based in the United States and using a United States bank, accumulation of income including interest on the funds that are on deposit or gains brought about by virtue of investment would be required to be reported.

66.

There is also an issue at Phoebe regarding the waiver of co-payments. Phoebe Putney routinely waived co-payment for patients with Blue Cross & Blue Shield. This required them to write off the out-of-network part of the co-payment and a person by the name of Nicole Bruder kept a log of all of those patients whose co-payment was routinely waived. This is also an anti-kickback violation.

67.

Mr. Loudermilk also instructed Mr. Moree to maximize the wage index. Mr. Moree believed that he was doing things completely appropriately, however, Draffen & Tucker and two individuals, Mike Drayhush and Burt Bennett, were auditors who discovered there were errors in the payroll system which were causing the wage index to be inflated.

68.

On numerous occasions when Mr. Moree would go to meetings at other hospitals, those hospitals' officers or employees would inquire of him how Phoebe Putney got the wage index so much higher than any other place in the state. Mr. Moree would tell them what he had done, and they would report back to him that that such measures did not increase their wage index nearly as much as it did for Phoebe Putney.

69.

When the errors in the payroll system which caused the wage index to be inflated were detected by the auditors, upon information and belief, Mr. Moree does not believe that Phoebe Putney reported these errors to the government or made any reimbursements to the government.

70.

Anesthesia services in a hospital environment are normally provided by board-certified anesthesiologists. These anesthesiologists normally bill the patient directly for the services they provide, and submit separate claims for reimbursement under Part B for Medicare.

71.

Sometimes, particularly in smaller rural referral centers, some anesthesia services are provided by Certified Registered Nurse Anesthetists (CRNA) who provide these services at the direction of and in support of a licensed physician. In some cases, in smaller facilities, that licensed physician may be the surgeon who is performing surgery. In larger facilities, like Phoebe Putney, there are anesthesiologists who oversee and supervise the administration of anesthesia by CRNA personnel.

72.

CRNA personnel are employed by the hospital: Phoebe Putney employs and pays the salaries of the CRNA staff.

73.

At Phoebe Putney at where charges are submitted to Medicare under the Prospective Payment System (PPS), the charges associated with CRNA personnel providing anesthesia for a specific Medicare patient would be part and parcel of the payment made to the facility under the Diagnosis Related Group (DRG) that mandated the surgery. The costs associated with CRNA personnel could not be billed separately by the hospital.

74.

For some time, since at least the advent of PPS at PPMH, anesthesia services provided by CRNAs have been billed under the professional component of the supervising Anesthesiologist under Part B.

75.

Albany Anesthesia, a private for-profit professional corporation owned and managed by Lamar Moree, M.D. (no relation to relator Moree) provides anesthesia services to patients at PPMH.

76.

Lamar Moree, M.D., also sits on the Phoebe Putney Health System Board and on the Finance Committee.

25

77.

At some point in 2003 Alan Moree became aware that Dr. Lamar Moree and Phoebe Putney were improperly billing for CRNA services in that charges were being submitted to Medicare under Part B even though the CRNA personnel were employees of the hospital.

78.

In a meeting with Kerry Loudermilk, Alan Moree raised the issue with him about the possibility that the hospital was engaging in improper conduct by allowing its employees to be revenue generators for a private physician group. He asked for guidance on how to solve the problem.

79.

Several weeks went by after Alan Moree raised the issue with Loudermilk. When he received no feedback, he again went to Loudermilk and was told to "leave the issue alone."

80.

On information and belief, Albany Anesthesia, Lamar Moree, M.D., Albany Anesthesia's billing agents and employees are submitting false claims to Medicare Part B by billing for time and anesthesia provided by CRNA personnel working for and paid by PPMH.

81.

On information and belief, PPMH is providing to Albany Anesthesia and Lamar Moree, M.D., an illegal kickback under the Anti-Kickback Statute (42 U.S.C. §1320a-7b) in that Albany Anesthesia is "knowingly and willfully solicit[ing] or receiv[ing] [a form

of] remuneration ... indirectly, ... in kind ... in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare] or a State health care program, or by "...ordering, or arranging for ...[a] service, or item for which payment may be made in whole or in part under [Medicare] or a State health care program."

82.

In late August of 2004, Relators Charles Rehberg and John Bagnato received correspondence from an anonymous employee of Phoebe which urged Relator to "look at the Medicare Wage Index" for Phoebe and stated that Phoebe has filed "fraudulent Medicare Cost Reports and reaped $10's of millions in the last 4-5 years from it." That correspondence stated:

Mr. Rehberg,
I have watched and admired your willingness to put yourself on the line against Phoebe Putney. I work here and know it to be a very unethical place. This place has been grossly mismanaged, especially since Kerry Loudermilk has been here. Ed Ollie would have never advocated the type of behavior that he exemplifies. He is without a doubt the worst manager that I've ever worked for. Anyway . . . enough about him . . . you are very much in the process of uncovering his shady dealings.

A couple of points to ponder. Why have we not filed our fiscal year ending 07/31/03 Form 990? I promise, that when we do, it will look much different than the FY02 report. There will be no addresses for Board members on it, for example. Instead of full disclosure, there will be minimal disclosure . . . at Kerry's instruction.

Also, why don't you take a look at the Medicare Wage Index for the Albany MSA, composed primarily, of course, of PPMH wages. It's the highest in the state and there is a reason, and senior management knows it. We have filed fraudulent Medicare Cost Reports and reaped $10's of millions in the last 4-5 years from it.

If you will look at the 990's you'll recognize that they have transferred $10's of millions of investments from PPMH (in the public's eye) to PPHS (not for the public). This was a mere note to the financial

27

statements.

We have been instructed to set our pricing at levels to maximize medicare outlier payments (see Tenet Health Systems).

You've only begun to peel back the onion. I wish that I could publically support you, but, I need my job!

There are, however, some upper management personnel that recently left our employment that may be willing to talk to you. If you'll do some investigation, you can quickly figure out who recently left the Finance Division.

A copy of this anonymous correspondence is attached to the original Complaint as Exhibit "A."

83.

A review of Phoebe's Medicare Cost Reports confirms a dramatic and incredible rise in the wage index reported by Phoebe. The rise in the Albany wage index from .7975 in 1999 to 1.0372 in 2000 represents a 30 percent increase in the wage index and a 21.3 percent increase in the DRG payment rate for Phoebe. Between 1999 and 2000 when the increase occurred, DRG payments, including outlier payments, to Phoebe increased from approximately $35.1 million to approximately $43.1 million. The compounding effect on add-on payments caused all Medicare inpatient payments to Phoebe to increase from approximately $50.0 million to approximately $62.3 million in one year.

84.

Dougherty and Lee County, Georgia compose an MSA which includes the City of Albany and only two hospitals, Phoebe Putney Memorial Hospital and Palmyra Medical Center. Below is a table of hourly wages reported over the past nine years in the Federal Register, including the weighted average and the weight of Phoebe in the calculation.

28

Table I

| Federal Fiscal Year | Phoebe | Palmyra | Weighted Average | Wage Index | Phoebe Weight[1] |
|---|---|---|---|---|---|
| 1997 | 16.31 | 18.52 | 16.8101 | .8597 | 77.37% |
| 1998 | 15.29 | 18.54 | 15.9028 | .7914 | 81.14% |
| 1999 | 16.12 | 18.39 | 16.5708 | .7993 | 80.14% |
| 2000 | 23.4976 | 18.2016 | 21.9678 | 1.0372 | 71.11% |
| 2001 | 21.9505 | 20.4202 | 21.6247 | .9933 | 78.71% |
| 2002 | 25.2523 | 18.6637 | 23.7363 | 1.0640 | 76.99% |
| 2003 | 25.9135 | 20.1183 | 24.6091 | 1.0594 | 77.49% |
| 2004 | 28.2025 | 21.9411 | 26.8394 | 1.0819 | 78.23% |
| 2005 | 30.7430 | 25.5461 | 29.7283 | 1.1277 | 80.47% |

[1] Calculated based on the reported weighted average.

Because of Phoebe's size relative to Palmyra, Phoebe has a significant influence, generally between 77 and 80 percent, on the wage index for the Albany, GA MSA. Between 1998 and 2005, Phoebe's reported hourly wage rate approximately doubled. This occurred despite the fact that according to data from the Georgia Department of Labor, average wages in Dougherty County and Albany are consistently ranked below comparable counties, metropolitan statistical areas, and the state-wide average.

85.

The change in the wage index reported by Phoebe has resulted in massive increases in federal payments. Based on the 2003 Cost Report submitted by Phoebe and after considering add-on payments for Indirect Medical Education and Disproportionate Share, the economic impact of each change in the wage index of .01 was approximately $603,541 in payments to Phoebe. For outpatient reimbursements, the economic impact of each change in the wage index of .01 was approximately $110,927.00 in payments to Phoebe.

## FIRST CAUSE OF ACTION

### False Claims Act; Presentation of False Claims 31 U.S.C. § 3729(a)(1)

86.

Plaintiffs repeat and reallege Paragraphs 1 through 86 as if fully set forth herein.

87.

Phoebe falsely manipulated its wage index data and knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Phoebe Putney presented or caused to be presented false or fraudulent claims for payment to the Indigent Care Trust Fund.

88.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

89.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## SECOND CAUSE OF ACTION

### False Claims Act:  Making Or Using False Record Or Statement
### To Cause Claim to be Paid
### (31 U.S.C. §3729(a)(2))

90.

Plaintiffs repeat and reallege Paragraphs 1 through 90 as if fully set forth herein.

91.

Phoebe knowingly made, used, or caused to be made or used false records or statements – i.e., the false certification and representations made or caused to be made by Phoebe when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Phoebe in submitting the cost reports – to get false and fraudulent claims paid or approved by the United States.

92.

By virtue of the false records or false statements made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## THIRD CAUSE OF ACTION

### False Claims Act; Conspiring to Submit False Claims
### (31 U.S.C. §3729(a)(3)

93.

Plaintiffs repeat and reallege Paragraphs 1 through 93 as though fully set forth herein.

94.

Phoebe and the John Doe Defendants conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3). As part of schemes and agreements to obtain reimbursements from the United States in violation of federal laws, these Defendants conspired together to receive illegal remunerations based on false wage index data.

31

95.

By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## **FOURTH CAUSE OF ACTION**

### **Payment By Mistake of Fact**

96.

Plaintiffs repeat and reallege Paragraphs 1 through 96 as though fully set forth herein.

97.

This is a claim for the recovery of monies paid by the United States to Phoebe as a result of mistaken understandings of fact.

98.

The false claims which Phoebe submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

99.

The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Phoebe certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

32

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

100.

Plaintiffs repeat and reallege Paragraphs 1 through 110 as if fully set forth herein.

101.

This is a claim for the recovery of monies by which Phoebe has been unjustly enriched.

102.

By directly or indirectly obtaining Government funds to which they were not entitled, Phoebe was unjustly enriched, and are liable to account and pay with amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION

### Disgorgement Of Illegal Profit, For Imposition Of A Constructive Trust And An Accounting

103.

Plaintiffs repeat and reallege Paragraphs 1 through 103 as if fully set forth herein.

104.

This is a claim for disgorgement of profits received by Phoebe because of illegal payments obtained by Phoebe under false and fraudulent wage index data submitted by Phoebe.

105.

Phoebe concealed its illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States.

33

106.

The United States did not detect Phoebe's illegal conduct.

107.

This Court has the equitable power to, among other things, order Phoebe to disgorge the entire profit they earned from business generated as a result of their violations of the False Claims Act.

## SEVENTH CAUSE OF ACTION

### Recoupment of Overpayments

108.

Plaintiffs repeat and reallege Paragraphs 1 through 108 as if fully set forth herein.

109.

This is a claim for recoupment for the recovery of monies unlawfully paid by the United States to Phoebe contrary to statute or regulation.

110.

The United States paid Phoebe certain sums of money to which they were not entitled, and Defendants are thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## EIGHTH CAUSE OF ACTION

### Common Law Fraud

111.

Plaintiffs repeat and reallege Paragraphs 1 through 111 as if fully set forth herein.

112.

Phoebe made material and false representations in their initial requests for interim

payments and in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.    The United States acted in justifiable reliance upon Phoebe's misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

113.

Had the true facts been known to the United States, Phoebe would not have received the interim payments or the inflated amounts on the cost reports.

114.

By reason of these interim payments and the inflated amounts on the cost reports, the United States has been damaged in as yet undetermined amount.

## NINTH CAUSE OF ACTION

### Violation of 31 USC § 3729(a)(7) Reverse False Claims

115.

Plaintiffs repeat and reallege Paragraphs 1 through 115 as if fully set forth herein.

116.

Defendants have been knowingly and consciously manipulating the wage index data by inflating that data in order to obtain greater reimbursement.

117.

Defendants have consistently created false records or statements, in the form of cost reports and other documentation, to support its claim for current changes in the wage index and to avoid disclosing its fraud in the changes that have occurred since at least 2000.

35

118.

Defendants are aware that they have been overpaid on Medicare and Medicaid admissions since at least 2000 and that they are obligated to repay those overpayments to the federal government.

119.

Defendants have continued to create false records in order to avoid, conceal, decrease, or diminish its obligation to repay the Medicare program for wrongful payments based on the inflated wage index.

120.

As such it is liable to the government for three times the amount of the over-payments.

121.

Defendants are also liable for a civil penalty attaching to all claims for reimbursement made between 1997 and 2004 in an amount no less than $5,500 nor more than $11,000 per claim.

## **TENTH CAUSE OF ACTION**

### **Submission Of False Claims In Violation Of 31 USC § 3729(a)(1)**

122.

Plaintiffs repeat and reallege Paragraphs 1 through 122 as if fully set forth herein.

123.

Because PPMH must certify its compliance with all applicable Medicare and Medicaid regulations as a condition of payment under the Prospective Payment System,

the false certification of compliance, which has been willfully and knowingly done, constitutes a false claim under 31 USC § 3729.

124.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

125.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## **ELEVENTH CAUSE OF ACTION**

### **Creation Of False Records 31 USC § 3729(a)2 (PPMH)**

126.

Plaintiffs repeat and reallege Paragraphs 1 through 126 as if fully set forth herein.

127.

By allowing its CRNA staff to be used by Albany Anesthesia in violation of federal law and regulation, CRNA staff are not being used or paid for a lawful purpose and their salaries and the costs associated with them are not properly part of the Medicare Cost Report.

128.

In submitting Medicare Cost Reports to Medicare claiming the salary and benefit costs of CRNAs that are the private leased employees of Albany Anesthesia and over

37

whom PPMH does not maintain supervisory control, defendant PPMH has engaged in the creation of false records in support of false claims.

129.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

130.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## TWELFTH CAUSE OF ACTION

### Creation of False Records 31 USC § 3729(a)2
### (Albany Anesthesia)

131.

Plaintiffs repeat and reallege Paragraphs 1 through 131 as if fully set forth herein.

132.

By submitting claims for CRNA staff who are employees of PPMH, in violation of federal law and regulation, Albany Anesthesia created false records in support of a false claim.

133.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

38

134.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

### THIRTEENTH CAUSE OF ACTION

### Conspiracy Under 31 USC § 3729(a)3
### (PPMH, Lamar Moree, Albany Anesthesia)

135.

Plaintiffs repeat and reallege Paragraphs 1 through 135 as if fully set forth herein.

136.

Dr. Lamar Moree individually and in the capacity of the primary shareholder in Albany Anesthesia, by virtue of his position on the Board of PPMH, and in view of his extremely cordial relationship with PPMH, conspired with the officers, directors, or high managerial agents of PPMH to create a situation where PPMH would pay its CRNA staff, and Dr. Lamar Moree and his company, Albany Anesthesia, would obtain the benefit therefrom.

137.

The arrangement was a form of excess or additional compensation that PPMH would pay, under the table, in non-taxable form, and created a private inurement issue that could not be disclosed to the public.

138.

Defendants, and each of them, at all times knew that their arrangement was in violation of 42 U.S.C. §1320a-7b, amounted to a criminal conspiracy, and was part of a

conspiracy to submit false and fraudulent claims by both PPMH (by failing to disclose the relationship and the payment of its CRNAs for unlawful purposes) and Albany Anesthesia and Lamar Moree (by submitting false records in support of false claims made to Medicare Part B).

139.

When given the opportunity to unwind the unlawful arrangement by Relator Allan Moree, Defendants failed and/or refused to do so.

140.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

141.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## **FOURTEENTH CAUSE OF ACTION**

### **Reverse False Claims In  Violation of 31 USC § 3729(a)7**

142.

Plaintiffs repeat and reallege Paragraphs 1 through 142 as if fully set forth herein.

143.

Once the wrongful arrangement of Anesthesia services was called to the attention of the Chief Financial Officer, Loudermilk, PPMH knew that it was in an unlawful arrangement for the provision of anesthesia services.

144.

After being informed of the unlawful arrangement by Moree, CFO Loudermilk directed Moree to stop pursuing the matter.

145.

In the normal course of business after finding that it was paying for employees who were being used by a separate entity, and that the separate entity was recovering the costs associated with those employees without reimbursement to the facility, reporting and accounting entries reflecting the charge offs should have been made in the normal course of business.

146.

By refusing to allow Moree to continue to investigate and make those record entries, Loudermilk created a false record to avoid, decrease, or eliminate an obligation to repay money to the United States.

147.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

148.

By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## PRAYERS FOR RELIEF

149.

WHEREFORE, Plaintiffs demand and pray that judgment be entered in their favor against Defendants, jointly and severally, as follows:

150.

On the First, Second, Third, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, for a qui tam relators share as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

151.

On the Fourth, Fifth and Seventh Causes of Action, for payment by mistake, unjust enrichment, and recoupment, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

152.

On the Sixth Cause of Action for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits

obtained by Defendants and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further and equitable relief as may be just and proper.

153.

On the Eighth Cause of Action for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the ___ day of April, 2005.

**VROON & CRONGEYER, LLP**

BY: _____
Bryan A. Vroon, by Ralph
Scoccimaro with express permission
Georgia Bar No. 729086

BY _____
John W. Crongeyer, by Ralph
Scoccimaro with express permission
Georgia Bar No. 197267

1230 Peachtree Street, Suite 2450
Atlanta, Georgia 30309
Telephone: (404) 607-6710
Facsimile: (404) 607-6711

**BROWN & SCOCIMARO, P.C.**

BY:

Jimmie H. Brown, by Ralph
Scoccimaro with express permission
Georgia Bar No. 088134

BY:

Ralph Scoccimaro
Georgia Bar No. 631525

P.O. Box 1646
Albany, Georgia 31702
Telephone: (229) 432-9310
Facsimile: (229) 436-6302

Edward D. Robertson, Jr.
Missouri Bar No. 27183
Anthony L. DeWitt
Missouri Bar No. 41612
Bartimus, Frickleton, Robertson & Obetz, PC
715 Swifts Highway
Jefferson City, MO 65109
Telephone: (573) 659-4454
Facsimile: (573) 659-4460

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. rel., <br> CHARLES REHBERG, JOHN BAGNATO, M.D. <br> and ALAN MOREE | ) <br> ) <br> ) Civil Action No.: 1:04-CV-162 (WLS) |
| Relators/Quitam Plaintiffs, | ) <br> ) <br> ) |
| vs. | ) <br> ) |
| PHOEBE PUTNEY HEALTH SYSTEMS, INC.; <br> PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.; <br> LAMAR MOREE, M.D.; ALBANY ANESTHESIA, <br> JOHN DOES 1 THROUGH 100, | ) **TO BE FILED IN CAMERA** <br> ) **AND UNDER SEAL** <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing

**First Amended Quitam Relator Complaint Under 31 U.S.C. §3729, Federal False**

**Claims Act** by depositing a true and correct copy of same by **Certified Mail** in the

United States Mail, postage prepaid, addressed as follows:

> Peter Keisler
> Maxwell Wood
> Michael F. Hertz
> Laurence J. Freedman
> Marie V. Bonkowki
> Attorneys, Civil Division
> U.S. Department of Justice
> P.O. Box 261 Ben Franklin Station
> Washington, D.C. 20044

This _____ day of April, 2005.

Bryan A. Vroon, by Ralph Scoccimaro with
express permission