# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

UNITED STATES OF AMERICA, ex. rel.,          )
CHARLES REHBERG, JOHN BAGNATO, M.D.          )
and ALAN MOREE                               ) Civil Action No.: 1:04-CV-162 (WLS)
                                             )
        Relators/Quitam Plaintiffs,          )
                                             )
vs.                                          )
                                             )
PHOEBE PUTNEY HEALTH SYSTEMS, INC.;          ) **TO BE FILED IN CAMERA**
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.;       ) **AND UNDER SEAL**
JOHN DOES 1 THROUGH 100,                     )
                                             )
        Defendants.                          )
_____)

## SECOND AMENDED QUITAM RELATOR COMPLAINT
## UNDER 31 U.S.C. § 3729, FEDERAL FALSE CLAIMS ACT

Come Now Relators, Charles Rehberg, John Bagnato, M.D., and Alan Moree, by
and through their counsel of record, and for the Second Amended Complaint against the
Defendants Phoebe Putney Health Systems, Inc. and Phoebe Putney Memorial Hospital,
Inc. (sometimes collectively referred to as "Phoebe") and state to the Court as follows:

1. This is an action to recover damages and civil penalties on behalf of the United
   States of America arising out of the false claims presented for payment by
   Defendants under the Federal Medicare Program. This action arises under the
   provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims
   Act which provides that the United States District Courts shall have exclusive
   jurisdiction of actions brought under that Act.

2. Section 3732(a) of the Act provides that "Any action under section 3730 may be
   brought in any judicial district in which the defendant or, in the case of multiple

defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

3. An action for violation of the False Claims Act may be brought by the Attorney General under 31 U.S.C. § 3730(a) or by private persons under the qui tam provisions of 31 U.S.C. § 3730(b).

4. The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because at least one of the defendants resides or transacts business in the Middle District of Georgia.

5. Venue is proper in the Middle District of Georgia under 31 U.S.C. §3732 and 28 U.S.C. § 1391(b) and (c) because Defendants reside or transact business in that District.

6. Alan Moree is former Assistant Vice President of Finance at Phoebe Putney Memorial Hospital. In the course of his working relationship with Phoebe Putney, Relator Alan Moree learned that certain management decisions of the health systems facilities were contrary to the statutory and regulatory dictates found in federal and state law. The specific information known to Mr. Moree implicates the need for a thorough criminal and civil investigation into Phoebe Putney.

7. Relator John Bagnato, MD, is a surgeon and resident of Albany, Georgia, and was a physician and surgeon practicing at defendant hospital from 1998 through June, 2007. Dr. Bagnato has consistently attempted to convince Phoebe Putney to institute corporate safeguards regarding conflicts of interests at the institution, and

2

has been active and vocal in opposing policies, procedures, and practices that he believes are contrary to good medicine and against the best interests of his patients.

8. Relator Charles Rehberg is a Certified Public Accountant, a Certified Forensic Accountant, and a fellow of the Healthcare Financial Management Association. He has almost 25 years of experience in healthcare finance as a financial auditor, Medicare cost report preparer, and auditing hospitals for compliance with Medicare statutory and regulatory requirements. He was also formerly the Chief Financial Officer of a non-profit community hospital in Georgia. Relators are well known in the community, particularly among physicians, health care workers, and employees of Phoebe Putney Memorial Hospital, as individuals who oppose fraudulent and corrupt practices in health care.

9. Relators are the original source of the information, investigation, and analysis upon which this Second Amended Complaint is based.

10. The Relators have previously served a copy of the Complaint and First Amended Complaint "and written disclosure of substantially all material evidence and information the person possesses" upon the Government. 31 U.S.C. § 3730(b)(2). Relators have complied with this Code Section.

## The False Claim Act

11. The False Clams Act ("FCA") provides in pertinent part:

> (a) Any person who (1) knowingly presents or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Force of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by

3

the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . or (7) knowingly makes, uses, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## **The Medicare Program**

12. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

    Medicare Program, to pay for the costs of certain healthcare services. Entitlement

    to Medicare is based on age, disability or affliction with end-stage renal diseases.

    *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment

    for institutional care, including hospital, skilled nursing facility and home health

    care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Phoebe, derive

    a substantial portion of their revenue from the Medicare Program.

13. HHS is responsible for the administration and supervision of the Medicare

    Program. CMS is an agency of HHS and is directly responsible for the

    administration of the Medicare Program. CMS was formerly known as HCFA.

14. Under the Medicare Program, CMS makes payments retrospectively (after the

    services are rendered) to hospitals for inpatient services. Medicare enters into

    provider agreements with hospitals in order to establish the hospitals' eligibility

4

for participating in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

15. As detailed below, Phoebe submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

16. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. §1395h. Fiscal immediacies (FI's), typically insurance companies, are responsible for processing and paying claims and auditing cost reports. At all times relevant herein, the fiscal intermediary to which Phoebe submitted Medicare claims was Blue Cross Blue Shield of Georgia.

17. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 (formerly called a HCFA Form UB-92).

18. As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually form CMS-2552 (formerly called a HCFA-2552), more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

19. After the end of each hospital's fiscal year, the hospital files its Hospital Cost

5

Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. §1395g(a); 42 C.F.R. §413.20. *See also* C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

20. During the year, providers, such as hospitals, submit claims to their assigned FIs for reimbursement, based upon hospital utilization by Medicare beneficiaries. 42 C.F.R. §§ 413.1, 413.60, 413.64. Providers receive interim payments on these claims. Within a specified time after the end of the hospital's fiscal year, the hospital must submit its cost report to its FI so that the FI can make a year-end adjustment to the interim payments, as needed. 42 C.F.R.§ 413.20(b). Cost reports are the final claim that a provider submits to its FI for items and services rendered to Medicare beneficiaries.

21. Cost reports contain important detailed financial and statistical data relating to the provider and form the basis for a determination by Medicare whether the provider it entitled to more reimbursement than already paid, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

22. Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the Hospital Cost Report, the

6

Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare Program or the amount due to the provider.

23. Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by Phoebe to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. That right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. §413.64(f).

24. Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

25. At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

26. In or about 1996, the Hospital Cost Report was revised to include the following

7

notice:

> Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

27. Phoebe is and was at all relevant times familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

28. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

29. Hospital Cost Reports submitted by Phoebe were, at all times relevant to this Second Amended Complaint, signed by Phoebe employees who attested, among other things, to the certification quoted above.

30. The Medicare program depends heavily upon the truthfulness of providers in completing their cost reports. At all times relevant to this Complaint it was common knowledge in the healthcare industry that the government lacks adequate resources to conduct a full-scope audit of each of the over 35,000 providers

nationwide, including hospitals, which file cost reports with Medicare each year.

31. To address this problem CMS has devised a methodology that subjects all cost reports to an automated uniform "desk review" process. Based on the results of the desk review, and the funds available for audit, intermediaries select providers for field audits. In 1997 for example, of 35,709 provider cost reports received from hospitals, skilled nursing facilities (commonly known as nursing homes), home health agencies, and other institutional providers for patient care, just over 5,000 (or approximately 14%) were selected for a field audit. Because of limited resources, field audits are usually limited to specific issues. Defendants took advantage of Medicare's limited resources by submitting false claims and false statements in their cost reports with the expectation that they would not be discovered upon audit.

32. Medicare requires providers to maintain complete and accurate cost information and to prepare their cost reports based on that information.

33. CMS's Provider Reimbursement Manual ("PRM") contains additional instructions to providers for the preparation of their cost reports. The PRM requires providers to maintain and make available to their FIs current, accurate cost information from its books and records. PRM Pt. I §§ 2300; 2304; 2304.1.

34. Thus, under the applicable regulations and instructions, a Medicare cost report must be based upon all of the hospital's cost records, which must then be made available to Medicare for examination. 42 C.F.R. §§ 413.20(d), 413.24; PRM Pt. I §§ 2300, 2304, 2304.1.

9

35. A hospital may not conceal or withhold pertinent financial data it knows, or should know, potentially affects the amount of Medicare reimbursement properly owing to the hospital.

36. The information required to file an accurate Medicare cost report are the ordinary records maintained by a hospital in the normal course of business. At all times relevant to this complaint, Phoebe had or should have maintained the records required to file an accurate cost report.

37. 42 U.S.C. § 413.24 states the following requirements regarding a Medicare provider's obligation to maintain cost and statistical data capable of verification by qualified auditors:

> 42 U.S.C. § 413.24 (a)
>
> Principle. Providers receiving payment on the basis of reimbursable cost must provide adequate cost data. This must be based on their financial and statistical records which must be capable of verification by qualified auditors...
>
> 42 U.S.C. § 413.24 (c)
>
> Adequacy of cost information. Adequate cost information must be obtained from the provider's records to support payments made for services furnished to beneficiaries. The requirement of adequacy of data implies that the data be accurate and in sufficient detail to accomplish the purposes for which it is intended. Adequate data capable of being audited is consistent with good business concepts and effective and efficient management of any organization, whether it is operated for profit or on a nonprofit basis. It is a reasonable expectation on the part of any agency paying for services on a cost reimbursement basis. In order to provide the required cost data and not impair comparability, financial and statistical records should be maintained in a manner consistent from one period to another. However, a proper regard for consistency need not preclude a desirable change in accounting procedures if there is reason to effect such change.

38. The applicable instructions contain "protest" procedures for a provider to dispute regulatory and policy interpretations through the appeals process established by the Social Security Act. In order to establish an appeal issue, the provider must include the unallowable item in the cost report, and the disputed item must pertain to the cost reporting period for which the cost report is filed. PRM Pt. II § 115.

39. The instructions further provide that when a provider files a cost report under protest, the disputed items and the amount for each issue must be specifically identified in footnotes to the settlement worksheet of the cost report, and the fact that the cost report is filed under protest must be disclosed. PRM Pt. II § 115.1.

40. Defendants are, and were at all times relevant to this complaint, familiar with the Medicare law, regulations, instructions, and the PRM governing the preparation and submission of Medicare cost reports.

41. In addition, if a hospital discovers errors and omissions in its claims submitted for reimbursement to Medicare (including its cost reports), it is required to disclose those matters to its FI. 42 U.S.C. § 1320a-7b(a)(3) creates a duty to disclose known errors in cost reports: "Whoever . . . having knowledge of the occurrence of any event affecting his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony."

## The Medicaid Program

42. Medicaid is a joint federal-state program that provides health care benefits for

certain groups, primarily the poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

43. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FPF"), 42 U.S.C. §§ 1396, *et seq.*

44. Each state's Medicaid program must cover hospital services. 42 U.S.C. §1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

45. Provider hospitals participating in the Medicaid program file annual cost reports with the single state agency administering the particular state's Medicaid program, or its FI, in a protocol similar to the one governing the submission of Medicare cost reports.

46. In some states provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states provider hospitals file a separate Medicaid cost report.

47. Providers incorporate in these separate Medicaid cost reports the same type of financial and statistical data contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

48. Typically, each state requiring the submission of a Medicaid cost report also requires that an authorized agent of the provider expressly certify that the information and data contained within the submitted cost report is true and correct.

49. This Medicaid patient data is then utilized by individual Medicaid programs to determine the reimbursement to which the facility is entitled. On the Hospital Cost Report, the Medicaid liability for patient services is then totaled with any other Medicaid liabilities to the provider. This total determines Medicaid's liability for services rendered to Medicaid beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicaid Program or the amount due to the provider.

50. Where a provider submits the Medicare cost report to Medicaid, false or incorrect data or information contained in the Medicare cost report necessarily causes the submission of false or incorrect data or information to the state Medicaid program.

51. Where a provider submits the Medicare cost report to Medicaid, the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

52. Where a provider submits a Medicaid cost report that contains the same false or incorrect information contained in the provider's Medicare cost report, false statements and false claims have been made for reimbursement from Medicaid.

53. The United States has been damaged whenever a state Medicaid program has been damaged by the Defendants' submission of false claims and false statements because the United States funds a portion of each state's Medicaid program as described above.

13

54. Provider hospitals participating in the Medicaid program file a copy of their Medicare cost reports with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.

55. At all material times, the Medicaid Program was administered in the State of Georgia by the Office of the Governor, State of Georgia, Medicaid Division ("Georgia Medicaid").

56. Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

57. Phoebe sought reimbursement from the Georgia Medicaid program for the time period pertinent to this Second Amended Complaint.

## INTRODUCTION TO TRICARE/CHAMPUS

58. At all times relevant to this Second Amended Complaint, the Phoebe Putney Defendants were enrolled in, and sought reimbursement from TRICARE/CHAMPUS.

59. TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services, to the spouses and unmarried children of active duty retired service members, to the spouses and unmarried children of reservists who were ordered to active duty for thirty days or longer, and to the unmarried spouses and children of deceased service members and to retirees. Hospital services at non-military facilities are sometimes provided for active duty

14

members of the armed forces, as well. 10 U.S.C. §§ 1071-1109; 32 C.F.R. § 199 *et seq.*

60. TRICARE/CHAMPUS reimburses hospitals for two types of costs, both of which are based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.14(a).

61. A provider seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS prescribed form entitled, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement)."

62. In the Request for Reimbursement, the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relate to these two cost areas covered by TRICARE/CHAMPUS (i.e. capital costs and direct medical education costs), which is derived from the Medicare cost report for that facility.

63. Upon receipt of a hospital's Request for Reimbursement and the provider's financial data, TRICARE/CHAMPUS or its FI applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patient days as a percentage of total patient days in the facility.

64. This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

15

65. In addition, a hospital is required to be familiar with its duties and responsibilities under the TRICARE/CHAMPUS program. 32 C.F.R. §§ 199.6(a), 199.9(a)(4).

66. TRICARE/CHAMPUS relies upon the honesty of the provider in disclosing any and all false statements, submissions, errors and necessary corrections or adjustments to the Medicare cost reports, so that similar adjustments can be made by TRICARE/CHAMPUS.

67. The Phoebe Defendants submitted Requests for Reimbursement to TRICARE/CHAMPUS that were based on their Medicare cost reports. Whenever the Phoebe Defendants' Medicare cost reports contained falsely inflated or incorrect data or information from which they derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

68. Whenever the Defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, the Phoebe Defendants' employees falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

69. Upon information and belief, Defendants knowingly failed to notify TRICARE/CHAMPUS of errors in the wage index data presented in their Medicare cost reports as required when those errors would have decreased the amount of reimbursement the Defendants were entitled to receive and retain from TRICARE/CHAMPUS.

16

70. Whenever the Phoebe Defendants did not notify TRICARE/CHAMPUS of errors in their Medicare cost reports, they accepted and retained reimbursement from TRICARE/CHAMPUS of more than they were entitled to receive and retain.

71. The Phoebe Defendants knew that false claims contained in their Medicare cost reports often would affect TRICARE/CHAMPUS reimbursement as well.

## INTRODUCTION TO THE WAGE INDEX

72. Most health care providers which have entered into provider agreements with the Secretary, including Phoebe, are reimbursed through the Prospective Payment System (PPS). This system reimburses hospitals not for their actual incurred costs but for costs based on prospectively fixed rates for each category of treatment.

73. Hospitals receive payment for the services they perform on Medicare beneficiaries based upon the "diagnosis related group" (DRG) within which the service falls. 42 C.F.R. § 412.60 (2001). The payment rates for the upcoming federal fiscal year (FFY) for each DRG are published in the Federal Register, first in the form of a proposed rule and then in the form of a final rule published on or about August 1 for the FFY beginning on October 1 of that year. 42 U.S.C. § 1395ww(d)(6); 42 C.F.R. §412.8. This system notifies hospitals in advance of the amount of payment they should expect to receive per patient for each DRG.

74. In order to account for wide variations in the cost of labor across the country, the amount of a hospital's payment under the PPS will vary depending on its location. First, hospitals are assigned a standardized rate based on whether they are located in a county in a "large urban," urban," or "rural" area. *See Athens Cmty. Hosp.,*

*Inc. v. Shalala,* 305 U.S. App. D.C. 428, 21 F.3d 1176, 1177 (D.C. Cir. 1994). A wage area in a "large urban" or "urban" location was known as a Metropolitan Statistical 'Area (MSA) and currently is referred to as Core-Based Statistical Area (CBSA). After calculating the standardized rate based on the area, the hospital's payment rates are computed by adjusting the standardized amount by a "wage index" to account for area wage differences. 42 U.S.C. § 1395ww(d)(3)(E).

75. The wage index is updated each year based on hourly wage data collected from the hospitals. Each hospital provides the Secretary with data including the total salaries paid to and hours worked by its employees. §1395ww(d)(3)(E). The Secretary computes the average hourly wage for a labor market area by adding the total of the allowed salaries and fringe benefits paid by the hospitals within that area, and dividing that figures by the related total number of hours worked. Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47,054, 47,074-76 (Aug. 1, 2000) (to be codified at 42 C.F.R. pts 410, 412, 413 & 485).

76. The Secretary uses this data to create the wage index for each geographic area. The wage index compares the average hourly wage for hospitals in a given geographic area with the national average hourly wage, which in turn determines the payment rate above or below the national average at which a hospital is reimbursed. The wage index for an area generally applies to all hospitals physically located within that geographic area.

77. Thus, the wage index has a significant effect on the amount of reimbursement a hospital receives.

78. Medicare statutes contain a well known formula for calculating prospective payment rates. The rates are derived by first calculating the average Medicare allowable costs per discharge during a base year, adjusted for inflation, for each hospital participating in the Medicare program. 42 U.S.C. §1395ww(d)(2)(A)(B). Adjusted averages for each hospital are then "standardized" to remove the effects of factors including indirect medical costs, wage variations, and "case mix" (that is, the relative complexity and costliness of each hospital's cases). 42 U.S.C. §1395ww(d)(2)(C).

79. A hospital's payment under PPS varies in part based on its geographic classification, in particular on whether the hospital is located or deemed to be located within an urban or rural area. 42 U.S.C. §1395ww(d)(2)(D). An urban area is defined as a Metropolitan Statistical Area ("MSA") or certain other specified localities. 42 U.S.C. §1395ww(d)(2)(D); 42 C.F.R. §412.62(f). Any other area is defined as a rural area. *Id.* The statute requires the Secretary to compute a separate average of hospital "standardized amounts" for rural and urban areas. 42 U.S.C. §1395ww(d)(2)(D). In addition, in making payments to particular hospitals, actual PPS payment rates for each DRG are computed by adjusting the appropriate standardized amount by a "wage index" to account for area wage differences. The wage index which reflects the relative level of wages and salaries for hospital workers in the area where the hospital is located compared to the national average hospital wage level 42 U.S.C. §1395ww(d)(3)(E).

80. The Secretary determines a separate wage index for each MSA (or more recently

19

CBSA) in the United States, and one wage index per state for rural counties and towns not located in an MSA / CBSA. The wage index used to adjust Medicare inpatient service payments for an individual hospital is the wage index that the Secretary determines and assigns to the area in which the hospital is physically located. The Secretary recalculates and revises the wage indices annually. This wage index is intended to compensate for regional differences in the costs of providing services of §1895ww(d)(3)(E); 42 C.F.R. Part 412.62. Generally, under PPS urban hospitals receive a higher reimbursement than rural hospitals.

81. Under PPS, Medicare authorities first construct a standard nationwide cost rate—the "federal rate" – based on the average operating costs of inpatient hospital services. *See* 49 Fed. Reg. 234, 251 (Jan. 3, 1984). They then assign a weight to each category of inpatient treatment, or "diagnosis-related group" ("DRG"). Finally, they calculate a "wage index" to adjust reimbursement rates to reflect regional variations in hospital wage costs. For each patient discharge, a hospital's final reimbursement is calculated by taking the federal rate, adjusting it for wage variations, and multiplying it by the weight assigned to the patient's DRG. *See generally* 42 U.S.C. §1395ww(d)(2)(1988).

82. The wage index reflects a requirement in the 1983 Amendments that the federal rate be adjusted to reflect geographic variations in labor costs. *See* 42 U.S.C. §1395ww(d)(2)(H). The area wage indexes for each region are based on wage-cost data periodically submitted by Medicare hospitals across the country. The indexes are used at two points in the prospective payment rate calculation. First, regional wage indexes are used (along with other factors, such as inflation and

20

hospital case-mix ratios) to modify and standardize the data used to establish the nationwide "federal rate." *See* 42 U.S.C. §1395ww(d)(2)(H). Because each wage index is used to develop the base national rate as well as to adjust that rate by region, a change in any single wage index can affect the reimbursement rate of each hospital in the country.

83. Using a published formula well known in the hospital industry, the Secretary computes the PPS payment rate for a particular provider on the basis of information in a wage index. The wage index reflects "the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. §1395ww(d)(2)(H). The wage index for a hospital is calculated by dividing "the average hourly wage paid by hospitals in that area by the national average hourly hospital wage." Once calculated, the wage index is used to help determine the amount of reimbursement that each provider is entitled to receive under the PPS. Under this formula, the higher the wage index for the area in which the hospital is located, the more reimbursement the hospital will receive per discharge.

84. The data used to calculate the wage index is collected directly from the providers by means of a "hospital wage survey" which is conducted by the Health Care Financing Administration ("HCFA"), now known as CMS. Every year, CMS updates the data that it collects from the providers on the basis of the information in Worksheet S-3, Part II and Part III of the provider's cost reports. 42 U.S.C. §1395ww(d)(3)(E). Based on the substantial amount of time that is needed for the provider to compile and submit the cost reports, and for the intermediary to

then review these reports, there is generally a four year lag between the date upon which the provider reports the wage data and the date when the wage index is published.

85. The Office of Inspector General (OIG) released its Work Plan for FY 2005 which raised concerns about the accuracy of hospital wage data. Below is a excerpt from the plan related to the OIG's perceived view of data reporting for wage indexes:

### Inpatient Prospective Payment System Wage Indices

We will determine whether hospital and Medicare controls are adequate to ensure the accuracy of the hospital wage data used for calculating wage indices for the inpatient prospective payment system. We believe that the wage indices are vulnerable to inaccuracy because the data used to calculate them for many metropolitan statistical areas are significantly influenced by information reported by a single hospital. Consequently, a hospital that reports incorrect wage data through its Medicare cost report could receive incorrect DRG reimbursement. We will determine the effect on the Medicare program in terms of incorrect DRG reimbursement.

*(OAS; W-00-04-35100; various reviews; expected issue date: FY 2005; work in progress)*

86. This case confirms the concerns of the Inspector General.

### Wages & Hours Worked Data (Worksheet S-3, Part II & Part III)

87. The purpose of Worksheet S-3, Part II is to gather the hospital facility specific data used to calculate the wage index that is an important component of each hospitals Medicare reimbursement. The last line of the worksheet directs the preparer to the instructions located in CMS Pub. 15-II, section 3605.2:

FORM CMS-2552-96 (5/2004) (INSTRUCTIONS FOR THIS WORKSHEET ARE PUBLISHED IN CMS PUB. 15-II, SECTION 3605.2)

22

88. The instructions in CMS Pub. 15-II, section 3605.2 begin as follows:

3605.2    Part II - Hospital Wage Index Information.--This worksheet provides for the collection of hospital wage data which is needed to update the hospital wage index applied to the labor-related portion of the national average standardized amounts of the prospective payment system.  It is important for hospitals to ensure that the data reported on Worksheet S-3, Parts II and III are accurate.  Beginning October 1, 1993, the wage index must be updated annually.  (See §1886(d)(3)(E) of the Act.)  Congress also indicated that any revised wage index must exclude data for wages incurred in furnishing SNF services.  Complete this worksheet for IPPS hospitals (see §1886(d)), any hospital with an IPPS subprovider, or any hospital that would be subject to IPPS if not granted a waiver.

89. The instructions specifically place the hospital on notice that the purpose of the information gathered on this form is for calculating the annual hospital wage index portion of the standardized amounts paid under the Medicare prospective payment system.  The instructions also emphasize the importance of reporting *accurate* information:  **"It is important for hospitals to ensure that the data reported on Worksheet S-3, Parts II and III are accurate."**

90. The instructions for this form continue in detailed fashion, directing the hospital as to what is included, what is excluded, and any applicable adjustments that must be made.   The instructions are line by line, column by column in nature.  Generally, this form is gathering dollar amounts of salaries and wages paid, the hours relating to these amounts, and the costs of certain employee benefits that are included in the calculation.

91. The pay methods used by Phoebe are the norm in the hospital industry—virtually every hospital has call pay, overtime pay, shift differentials, etc.  These pay systems are in effect for payroll calculations, budget calculations, and statistical reports used internally and reported to outside organizations for peer group comparisons.

23