92. The clear instructions provided for Worksheet S-3 are specific about how hours related to special categories of pay (i.e., overtime, holidays, severance, lunch hours, paid time off, on call hours, etc.) must be accounted for.

93. A copy of the applicable instructions are reproduced below:

> Column 4--Enter on each line the number of **paid** hours corresponding to the amounts reported in column 3. Paid hours include regular hours (including paid lunch hours), overtime hours, paid holiday, vacation and sick leave hours, paid time-off hours, and hours associated with severance pay. For Part II, lines 1 through 12 (including subscripts) and Part III, line 13, if the hours cannot be determined, then the associated salaries must not be included in columns 1 through 3 (10/97).
>
> **NOTE:** The hours must reflect any change reported in column 2; on call hours are not included in the total paid hours (on call hours should only relate to hours associated to a regular work schedule; overtime hours are calculated as one hour when an employee is paid time and a half. No hours are required for bonus pay. The intern and resident hours associated with the salaries reported on line 6 must be based on 2080 hours per year for each full time intern and resident employee. The hours reported for salaried employees who are paid a fixed rate are recorded as 40 hours per week or the number of hours in your standard work week (10/97).

> Column 5--Enter on all lines (except lines 13 through 20) the average hourly wage resulting from dividing column 3 by column 4.

> Column 6--Enter on the appropriate lines the source used to determine the data entered in columns 1, 2, and 4, as applicable. If necessary, attach appropriate explanations. This column is used to provide information for future reference regarding the data sources and to assist intermediaries in verifying the data and method used to determine the data.

94. Phoebe Putney had on staff numerous accountants responsible for compiling the wage index data. Such accountants familiar with the normal internal payroll reports should have been able to easily and accurately prepare this form. It is incumbent on the cost report preparer to become familiar with the payroll reports, discuss the format with knowledgeable personnel, test the accuracy of the data with appropriate audit and analytic procedures, and use the knowledge obtained to determine what adjustments must be made to accurately report the data. This

procedure is not unique to Phoebe nor is it complex for an accountant following basic precautions.

### The Provider Reimbursement Manual, Part I & Part II

95. The Provider Reimbursement Manual, Part I & Part II are considered the "bible" of reimbursement for hospitals. Part I, which consists of 30 chapters, mainly provides principals of reimbursement, allowable costs, cost accounting methods, and other technical guidance of a more general nature. Part II, consisting of 39 chapters, is more forms oriented, and is devoted largely to line by line instructions for completion of the hospital cost report. Part I & Part II together contain essentially all the information and instruction to successfully complete a Medicare cost report that complies with the rules and regulations of the Medicare Program.

96. The manuals are generally found in print form in every hospital. They are also available for viewing or download from the CMS website, as well as from most fiscal intermediaries.

### OVERPAYMENTS TO PROVIDERS

97. The Provider Reimbursement Manual - Part 1, chapter 24, page 24-8.2, provides the following guidance regarding overpayments to hospitals and other providers:

> 2409. OVERPAYMENTS TO PROVIDERS-GENERAL
>
> Once a determination of overpayment has been made, the amount so determined is a debt owed to the United States Government. Under the Federal Claims Collection Act of 1966, each agency of the Federal Government, pursuant to regulations jointly promulgated by the Attorney General and the Comptroller General of the United States, must attempt collection of claims of the Federal Government for money arising out of the activities of the agency. These regulations require the head of each agency to take action on a timely basis to collect claims of the United States.

98. The guidance regarding overpayments is explicit and specific and does not provide exceptions for one category of overpayment versus another.

25

## INTRODUCTION TO FACTS KNOWN BY ALAN MOREE, FORMER ASSISTANT VICE PRESIDENT OF FINANCE AT PHOEBE PUTNEY MEMORIAL HOSPITAL

99. Mr. Alan Moree worked for nine years at Phoebe Putney Memorial Hospital. He served as Assistant Vice President of Finance between 1995 and 2004. Mr. Moree worked directly under Phoebe Putney's Chief Financial Officer, Kerry Loudermilk. Mr. Moree's employment was terminated on or about May 15, 2004.

100. The termination of his employment came about after he refused to study the Medicare patient population and determine how Phoebe Putney could set its pricing to manipulate reimbursement for cost outliers. Mr. Loudermilk verbally instructed Mr. Moree to increase pricing so as to inflate reimbursement for cost outliers. After he was instructed to do this, Mr. Moree told Mr. Loudermilk that he believed that such manipulation was illegal and exactly the activity that led to the prosecution of Tenet Health. Mr. Moree requested that he receive written instructions on the matter. When Mr. Loudermilk refused to issue written instructions, Mr. Moree refused to follow the verbal instructions. After that disagreement, Mr. Loudermilk became unjustifiably critical of Mr. Moree's work performance. Mr. Moree later approached Mr. Loudermilk and suggested that he would resign in view of his disagreements with Mr. Loudermilk. Within about 24 hours, Mr. Moree and the Vice President of Human Resources, Dave Baranski, were working on the terms of his severance agreement.

101. The severance agreement contains a six month pay provision as well as a confidentiality provision. This confidentiality provision, to the extent that it

requires Mr. Moree to conceal fraud, false claims or illegal conduct by Phoebe Putney, is not enforceable.

## PHOEBE PUTNEY HAS ATTEMPTED TO IMPROPERLY INFLATE COST OUTLIERS

102.   In the first quarter of 2004, Mr. Loudermilk instructed Mr. Moree to study the Medicare patient population and determine how the hospital could manipulate and inflate its pricing so as to increase reimbursement for cost outliers. Cost outliers are outliers which are created as result of exceptional charges for certain types of procedures.

103.   At the time of Mr. Loudermilk's instruction, Tenet Health was in the news for similar conduct and practices. The Office of the Inspector General of Health and Human Services (HHSOIG) had indicated that they would examine any hospital whose cost outliers were greater than 10%. At the time, the cost outliers at Phoebe Putney Memorial Hospital were 4.25%. Mr. Loudermilk said that "the OIG has given us a target, I want you to move it to 9%." Mr. Loudermilk's idea was to game the system and manipulate charges to generate greater outlier payments. Mr. Moree did not believe this was lawful, and as a result he refused to do it.

104.   Sometime after Mr. Moree's departure in May 2004, on information and belief, he believes that Phoebe Putney instituted the study necessary to set the prices so as to obtain increased outlier payments.

## PHOEBE PUTNEY'S FALSE CLAIMS SUBMITTED TO THE INDIGENT CARE TRUST FUND

105.   In Georgia, hospitals are required to file a hospital financial survey which

27

is used to determine the hospital's compensation from the Indigent Care Trust Fund ("ICTF"). A hospital states in its report the amount of indigent care that it provides to charity patients.

106. The Georgia Department of Community Health then takes that information and, using federal funds, pays out to the institutions the amount of money equivalent to a calculated percentage of their charity care.[1] ICTF is

---

[1] The purpose of the federal Disproportionate Share Hospital (DSH) Program and Georgia's Indigent Care Trust Fund (ICTF) is to provide compensation to qualifying hospitals for services provided without charge or for a reduced charge to Medicaid and medically indigent patients. Two additional purposes of the ICTF are to provide primary health care programs for the medically indigent citizens and children of Georgia, and to expand Medicaid eligibility and services.

In 1981 federal legislation established the DSH Program. The Georgia General Assembly created the ICTF in 1990, which serves as the conduit for funds between the federal DSH Program and Georgia hospitals. The Georgia Department of Community Health's (DCH) Division of Medical Assistance administers the ICTF.

Medically indigent patients qualify to receive hospital services without charge or at a reduced charge at ICTF hospitals. Patients with incomes below 200% of the federal poverty guidelines published by the United States Department of Health and Human Services are defined as medically indigent by the rules of the ICTF. Patients with incomes below 125% of the federal poverty guidelines receive hospital services without charge. As of September 3, 2000, patients with income between 125% and 200% of the federal poverty guidelines receive hospital services at a reduced charge. Prior to September 3rd, the range was 125% to 185% of the federal poverty guidelines.

According to the rules of the ICTF, hospitals with remaining ICTF funds must provide services to medically indigent patients without charge or a reduced charge. It should be noted that ICTF hospitals may continue to serve medically indigent patients even after the ICTF funds are spent. The services patients receive without charge or at a reduced charge are hospital services and do not include fees charges by physicians who are not on the staff of the hospital. These non-hospital staff physician fees are the responsibility of the patient and may be covered through a third party payer such as Medicaid, Medicare, or private insurance.

In general, the hospitals that receive ICTF funds are hospitals that serve a higher than average number of Medicaid and other low-income patients. To qualify for ICTF funds, hospitals must meet two federal criteria and one of nine state criteria. The federal criteria deal with the availability of obstetrician services to Medicaid recipients and the percentage of a hospital's patients who receive Medicaid coverage. The nine state criteria include qualifying factors such as: the percentage of a hospital's patients that are

funded through voluntary intergovernmental transfers or contributions from participating public hospitals and other government entities, and matching federal funds.

107. The federal-to-hospital contributions match is approximately 60:40 for benefit expenditures and 50:50 for administrative expenditures. No money from

---

Medicaid recipients or low-income patients, children's hospitals, state teaching hospitals, and small rural hospitals.

The Disproportionate Share Hospital program is a federal program that aims to increase health care access for the poor. Hospitals that treat a "disproportionate" number of Medicaid and other indigent patients qualify to receive DSH payments through the Medicaid program based on the hospitals' estimated uncompensated cost of services to the uninsured.

The ICTF represents the largest component of DSH payments distributed through Georgia Medicaid. To participate in ICTF, a hospital must also be a DSH provider. To qualify for DSH, a hospital must satisfy both Federal criteria AND at least one of the state criteria.

**Federal criteria**
1. Provide non-emergency obstetrical services to Medicaid recipients (if those services were provided on December 22, 1987)
2. Have a Medicaid inpatient utilization rate of at least 1%

**State criteria**
1. Inpatient utilization rate greater than the mean rate plus one standard deviation
2. Low-income inpatient utilization rate greater than 25%
3. Medicaid charges greater than 15 of total charges
4. Hospitals with the largest number of admissions in its area
5. Children's hospital
6. Hospital designated as a regional perinatal center
7. Hospital designated a Medicare rural referral center and a Medicare DSH provider
8. State-owned and operated teaching hospital
9. A small, rural public hospital with a Medicaid inpatient utilization rate of at least 1%

Georgia Medicaid also requires each hospital to prepare and receive approval of a plan outlining specific spending proposals for 15% of its ICTF funding in primary care programs. Five percent of that amount may be spent on capital costs, such as building a primary care center at the participating hospital.

Georgia's general fund is used. Using a formula based on information about the hospitals' estimated uncompensated care, the Division of Medical Assistance determines the payment amount each hospital is eligible to receive and annually distributes ICTF funds to those hospitals.

108. In approximately 2002, Mr. Loudermilk decided to falsely manipulate how "charity" care was calculated for reimbursement from the Indigent Care Trust Fund. The information to generate the hospital financial survey cuts off at the fiscal year end on July 31st of every year. As of July 31st, the amount of indigent and charity care is reasonably well known. However, it was the instruction of Mr. Loudermilk that the information necessary to file charity care would not be compiled until a few days before the report was due in late December of each year. In late December when it became necessary to file this report, Mr. Loudermilk instructed the hospital staff to use figures of all hospital charges for the fiscal year ending July 31 that had not been reimbursed as of mid December. This manipulation of all unreimbursed hospital charges would not only include the patient who had insurance or claimed to have insurance and was then found not to, but it would also encompass those patients for whom a bill had simply not been paid by insurance or whose bills had been audited by insurance and the payment had not yet been received.

109. Mr. Loudermilk instructed Mr. Moree to obtain a patient population report that showed all patients with any charges which had not been reimbursed as of December 10th. Therefore, with no regard to whether insurance payments were pending or being processed or audited, at Mr. Loudermilk's instruction, the

30

information system produced a report which included all of the unreimbursed charges for the fiscal year, and that was the amount used to submit to the Indigent Care Trust Fund for reimbursement to Phoebe Putney.

110. This manipulation boosted the submitted amount of "indigent" and "charity care" and increased by millions of dollars the amounts collected by Phoebe Putney from the Indigent Care Trust Fund over the time period of 2002 through 2005. Mr. Loudermilk implemented this false reimbursement scheme in each of these years. Mr. Moree's employment with the Hospital ended in May 2004, but he has confirmation that the Hospital continued this scheme for the years 2004 and 2005.

111. The fraudulent abuse of the ICTF was done through the hospital decision support system. At the instruction of Mr. Loudermilk, Ms. Lyla Chammoun ran the report and provided the information.

112. In a meeting where Mr. Loudermilk announced this approach, there were other people present. In addition to Ms. Chammoun, there was Virginia Sizemore, who is now employed by South Georgia Medical Center in Valdosta (she left Phoebe Putney Memorial Hospital on or about 12-10-04). Ms. Sizemore was the Manager of Decision Support, and she was present. Jeff Head was the Manager of Revenue, and he was present in the meeting room. In addition, Mr. Moree and Ms. Chammoun were present. Mr. Moree and Ms. Sizemore objected to Mr. Loudermilk's scheme, however, he responded that the Department of Community Health would audit and correct any wrongdoing and Mr. Loudermilk

stated if "we" are not generating audit adjustments, then "we" were not "being aggressive enough."

113. The Georgia Department of Community Health Division of Medical Compliance has adopted rules governing the Indigent Care Trust Fund. Under Chapter 350-6-.03 (7) of the Rules of the Department of Community Health Division of Medical Assistance, "In the event that a disproportionate share hospital knowingly and willfully makes or causes to be made any false statement or misrepresentation of material fact with respect to the hospital's use of funds from the Trust Fund or in response to any request for information from the Department related to the Trust Fund, including without limitation the submission of any report required pursuant to these Rules, the Department may, in addition to any other legal remedies available, assess liquidated damages against the disproportionate share hospital under its Letter of Agreement in an amount not to exceed the disproportionate share payment for the year in which the false statement or misrepresentation occurred." [2]

114. As discussed above, Phoebe Putney submitted false reports for purposes of reimbursement under the Indigent Care Trust Fund for each of the years 2002, 2003, 2004, and 2005. Phoebe Putney submitted such false claims despite being audited in 2001 by the Department of Community Health and specifically instructed not to do exactly what Mr. Loudermilk deliberately chose to do again in the following years.

115. The exact amounts of ICTF funds paid to Phoebe Putney for each of the

---

[2] Rule 350-6-.03 was adopted on September 7, 1993.

years in question is posted on the website of the Georgia Department of Community Health. For the years 2002, 2003, 2004, and 2005, Phoebe Putney received Disproportionate Share ICTF payments in the amount of approximately $27,600,651.00. Under the Department of Community Health Rule 350-6-.03(7), the Department may assess liquidated damages against Phoebe Putney for this amount in addition to "every other remedy now or hereinafter enforceable at law, in equity, by statute, or under contract."

116. The liquidated damages provided by the ICTF Rules include the intergovernmental transfer from the hospital authority which is matched by federal funds. If enforced, this liquidated damages provision provides significant deterrence against hospitals submitting false claims.

## PHOEBE PUTNEY HAS PAID ILLEGAL KICKBACKS TO ALBANY ANESTHESIA

117. Anesthesia services in a hospital environment are normally provided by board-certified anesthesiologists. These anesthesiologists normally bill the patient directly for the services they provide, and submit separate claims for reimbursement under Part B for Medicare.

118. Sometimes, particularly in smaller rural referral centers, some anesthesia services are provided by Certified Registered Nurse Anesthetists (CRNA) who provide these services at the direction of and in support of a licensed physician. In some cases, in smaller facilities, that licensed physician may be the surgeon who is performing surgery. In larger facilities, like Phoebe Putney, there are

33

anesthesiologists who oversee and supervise the administration of anesthesia by CRNA personnel.

119. CRNA personnel are employed by the hospital: Phoebe Putney employs and pays the salaries and benefits of the CRNA staff.

120. At Phoebe Putney where hospital charges are submitted to Medicare under the Prospective Payment System (PPS), the charges associated with CRNA personnel providing clinical anesthesia services for a specific Medicare patient should be billed by the hospital under Medicare Part B, because such services are subject to the fee schedule. The payments for the CRNA services should be remitted by the Medicare Part B intermediary directly to Phoebe as the employing entity.

121. For some time, since at least the advent of PPS at PPMH, anesthesia services provided by CRNAs have been billed to Medicare Part B by both Phoebe and Albany Anesthesia, rather than Phoebe alone. This is impermissible; only Phoebe is eligible to submit bills to Medicare Part B for the direct clinical services of the Phoebe employed CRNA's.

122. Medicare FI's commonly pay the first claim received, if more than one claim is received for the same service. This procedure prevents duplicate payments for the same service.

123. Phoebe, like most hospitals, delays billing for services until several days after a patient is discharged. This is to allow time for all charges to properly post to the patient's account prior to billing.

34

124. Albany Anesthesia, on the other hand, filed bills for Part B services almost immediately after surgery was performed. This allowed Albany Anesthesia's improper claims for direct services of Phoebe employed CRNA's to be incorrectly processed and paid by the intermediary before the Phoebe bill was received.

125. As a result, Phoebe's proper bill for the Part B services rendered by the Phoebe employed CRNA's was denied, while the improper bill for the same service submitted by Albany Anesthesia was paid to Albany Anesthesia.

126. Each claim filed by Albany Anesthesia to Medicare Part B for direct services of the Phoebe employed CRNA's was a false claim. Each payment received by Albany Anesthesia for such service they were not eligible to bill was a payment of a false claim.

127. Based upon information and belief, Albany Anesthesia has received millions of dollars in Part B reimbursement that they were not eligible to receive. Rather, these payments should have properly been the property of Phoebe.

128. Phoebe executives had knowledge that this billing practice was occurring, and allowed the practice to continue. Allowing Albany Anesthesia to obtain payments which should have been the property of Phoebe constitutes an illegal kickback.

129. The illegal kickbacks generated by the illegal billing scheme must be distinguished from permissible billing that Albany Anesthesia also engaged in. Albany Anesthesia has also billed Medicare Part B for the professional component of the *supervising Anesthesiologist* under Part B, and payments for

35

such services have been remitted to Albany Anesthesia. This billing is proper and permissible.

130. Albany Anesthesia is a private for-profit professional corporation which provides anesthesia services to patients at Phoebe under an exclusive arrangement with Phoebe.

131. Two physician shareholders of Albany Anesthesia also serve as members of Phoebe entity boards of directors.

132. At some point in 2003 Alan Moree became aware that Albany Anesthesia and Phoebe Putney were both billing for CRNA services in that charges were being submitted to Medicare Part B by Albany Anesthesia for the services of the CRNA's, even though the CRNA personnel were employees of the hospital. It was discovered by Phoebe Putney Business Office personnel that Albany Anesthesia was submitting bills for the services of Phoebe-employed CRNA's. Albany Anesthesia could rightly bill for the *supervision* of the Phoebe-employed CRNA's, only. This discovery was made when payers (insurance companies, including the Medicare fiscal intermediary, Blue Cross / Blue Shield of Georgia) were denying anesthesia charges being billed by Phoebe Putney. The Business Office was informed by the payers that the CRNA charges were being paid to Albany Anesthesia as if they (Albany Anesthesia) had actually performed the procedure. Nicole Brueder, Assistant Vice-President of Businsess Affairs, and Wendy Allen in the Phoebe Putney Business Office discovered this improper billing arrangement and brought this issue to Alan Moree's attention.

133. Phoebe Putney did not bill for inpatient services for at least three (3) days

36

post discharge. This allowed all departments ample time to submit all chargeable items to the billing department prior to submission to the appropriate payer. This practice is fairly normal in the hospital industry. If, for example, surgery is performed on day one (1) of the stay and the patient remains in the hospital for two (2) additional days, then the hospital bill is not submitted for at least five (5) days after the surgery was performed. Anesthesiologists, on the other hand, normally bill for their services within one or two days after the surgery. The anesthesiologists would in this example submit their claim before the patient is discharged from the hospital and, obviously, before the hospital submits their claim.

134. In a meeting with Kerry Loudermilk, Alan Moree raised this improper billing issue and the fact that the hospital was engaging in improper conduct by allowing its employees to be revenue generators for a private physician group. Mr. Moree asked Mr. Loudermilk for guidance on how to solve the problem.

135. Several weeks went by after Alan Moree raised the issue with Mr. Loudermilk. When Mr. Moree received no feedback, he again went to Mr. Loudermilk who told Mr. Moree to "leave the issue alone."

136. On information and belief, Albany Anesthesia's billing agents and employees are submitting false claims to Medicare Part B by billing for time and anesthesia provided by CRNA personnel working for and paid by PPMH.

137. On information and belief, PPMH is providing to Albany Anesthesia an illegal kickback under the Anti-Kickback Statute (42 U.S.C. §1320a-7b) in that Albany Anesthesia is "knowingly and willfully solicit[ing] or receiv[ing] [a form

of] remuneration ... indirectly, ... in kind ... in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare] or a State health care program, or by "...ordering, or arranging for ...[a] service, or item for which payment may be made in whole or in part under [Medicare] or a State health care program."

## PHOEBE PUTNEY'S KNOWING SUBMISSION OF FALSE WAGE INDEX DATA

138. On numerous occasions when Mr. Moree would go to industry meetings where officials from other hospitals were present, those hospitals' officers or employees would inquire of him why Phoebe Putney's wage index was so much higher than any other place in the state. For example, at meetings among hospital executives, Mr. Moree remembers that Mr. Thacker, the Chief Financial Officer of Columbus Regional Medical Center, asked Mr. Moree why Phoebe Putney's wage index was so high. Mr. Moree recalls a similar question from Ms. Rhonda Perry, the Chief Financial Officer at Medical Center of Central Georgia. Mr. Moree and Mr. Loudermilk also had conversations with Burt Bennett at Draffin & Tucker in which Mr. Bennett indicated that he had been questioned by other hospital executives about why Phoebe Putney's wage index was so high. Mr. Bennett also recommended a review and audit of the wage index to Mr. Loudermilk. Mr. Loudermilk rejected such recommendation.

139. The Albany MSA wage index was so high that another hospital, Tift Regional, applied to become a part of the Albany MSA so as to increase its Medicare reimbursement rates.

38

140. At meetings where executives from other hospitals were present, Mr. Moree explained his understanding of the wage index and how Phoebe Putney calculated the wage index. At subsequent meetings, officers from other hospitals reported back to Mr. Moree that they followed similar procedures for calculating the wage index, however, their hospitals' wage index were much lower.

141. Mr. Moree's Department was responsible for compiling the data to prepare annual cost reports. Although Mr. Moree was not responsible for the preparation of the wage index data, he understood that the wage index data was a critical component of the cost report and a critical factor in determining future reimbursement for the hospital. Mr. Moree did not know why Phoebe Putney's wage index was elevated but he strongly believed based on the numerous concerns and questions expressed by officers from other hospitals that the wage index should be investigated to ensure accuracy. Mr. Moree had multiple conversations with Virginia Sizemore, Mike Drahush, and Todd Cox in which they all discussed the fact that numerous officers from other similar hospitals had questioned why the Phoebe Putney wage index was high and they all discussed the fact that the wage index should be reviewed and investigated.

142. In multiple conversations, Mr. Moree asked Mr. Loudermilk why Phoebe's wage index was so high. Mr. Loudermilk repeatedly responded to Mr. Moree's inquiries by emphatically instructing Mr. Moree not to investigate the wage index. Mr. Loudermilk instructed and ordered Mr. Moree not to investigate the reason why Phoebe's wage index was high.

143. Executives at Phoebe Putney have had a contentious and adversarial relationship with executives at the local competitor hospital, Palmyra Medical Center. Nevertheless, Mr. Moree recalls Mr. Loudermilk specifically stating "we need" to meet with Phoebe Putney's competitor hospital, Palmyra Medical Center, to determine ways to increase the Albany MSA wage index. Mr. Loudermilk was extremely focused on the wage index level to the point that he was willing to cooperate with competitor hospitals to increase the Albany MSA wage index. Despite such focus, he rejected any attempt by others to review or audit the wage index data at Phoebe Putney.

144. Mr. Loudermilk treated the payroll data at Phoebe Putney as a guarded secret, even within the Finance Department of the hospital. There was no legitimate reason for such secrecy and there was no legitimate reason why Mr. Loudermilk restricted access to the payroll data to only a few individuals at the hospital. Mr. Moree never had access to the payroll data.

145. After Mr. Moree's employment with Phoebe Putney was terminated, Mr. Drahush called Mr. Moree. Mr. Drahush told Mr. Moree that he was right in his suspicions of the wage index. Mr. Drahush informed Mr. Moree that Phoebe Putney had under-reported hours in their cost reports which caused the wage index to be falsely inflated. Mr. Drahush told Mr. Moree that an accountant at Draffin & Tucker, Burt Bennett, was also involved in the discovery of the false wage index submissions.

146. When the false payroll data which caused the wage index to be inflated was detected by the auditors, upon information and belief, Phoebe Putney did not