report these prior false submissions to the government or make any repayments to the government for previous overpayments based on the inflated wage index.

147.     Mr. Loudermilk knew that Medicare was the single largest payer source for the hospital. Mr. Loudermilk closely monitored every aspect of Medicare reimbursement and knew that the Wage Index was a key component of the hospital's reimbursement calculation for each inpatient DRG payment.

148.     Mr. Loudermilk and reimbursement managers at Phoebe Putney had ample access to wage index rules, regulations, and information. Mr. Loudermilk had full access and supervisory management responsibility for all aspects of the payroll system and payroll data.

149.     It is within the normal industry job descriptions of the Chief Financial Officer and other finance personnel to monitor and manage reimbursement and cost report issues. It is within the job description of accounting personnel to monitor for variances and investigate variances or potentially aberrant data. It is within the job description of all personnel to report possible compliance issues.

150.     Mr. Moree's understanding was that every compliance program requires that issues identified be investigated and corrective action be taken. Voluntary self disclosure is encouraged by the OIG, and is a key component of a Medicare Compliance Plan. Mr. Loudermilk repeatedly resisted such an approach to compliance and refused to permit any investigation of the wage index.

151.     Mr. Moree believed that there was no acceptable level of non-compliance; the burden is on the provider to self report regardless of amount or their internal expectation as to how the government will handle the problem. Mr. Loudermilk

repeatedly resisted efforts to ensure proper and diligent compliance with Medicare and Medicaid reimbursement requirements.

152.    In multiple instances described in this Second Amended Complaint, Mr. Loudermilk and Phoebe Putney acted in reckless disregard of compliance issues. He acted to exploit the probability that the government did not have sufficient resources to detect and audit false reimbursement submissions. Mr. Loudermilk emphatically and specifically directed Mr. Moree and others not to investigate the wage index when questioned why it was so high. There was no legitimate reason not to investigate the wage index after numerous individuals at other hospitals questioned why it was so high.

153.    Phoebe Putney had on staff numerous accountants responsible for compiling the wage index data. Such accountants familiar with the normal internal payroll reports should have been able to accurately prepare this form. It is incumbent on the cost report preparer to become familiar with the payroll reports, discuss the format with knowledgeable personnel, test the accuracy of the data with appropriate audit and analytic procedures, and use the knowledge obtained to determine what adjustments must be made to accurately report the data. This procedure is not unique to Phoebe nor is it complex for an accountant following basic precautions.

154.    Minimal precaution requires a hospital to compare the wage and hour data for the year being prepared with the data submitted in previous years. Variance analysis, which is simply the review of all items with significant increases or decreases, is the typical method used. The hospital must satisfy itself that all

42

significant variances are either identified, resolved, and corrected, or alternately the reason for the variance is identified and determined to be reasonable and correct.

155.     Based on information and belief, the overstatement of Phoebe's average hourly wage amount is due to the false under-reporting of a massive number of hours worked. The wage index increase was so significant that such an increase would likely represent a major misreporting of eligible worked hours. Counting employee hours worked is not a complex task. It is the most basic of accounting exercises. Payroll programs and spreadsheets can easily track and tally annual employee hours. Minimal precautions and variance analysis should have detected and corrected discrepancies long before Phoebe submitted certified cost reports attesting to the accuracy of the number of hours and wage index data. The hospital could easily compare its full-time employee equivalents (FTEs) to the number of employee hours reported to the government.

156.     Counting employee hours required nothing more than following the clear and simple instructions on Worksheet S-3.

157.     The false wage index data was submitted year after year and was not an aberrant accident or coincidence. The Defendants replicated and benefited from the same false statements and scheme over numerous years.

158.     Phoebe Putney reaped tens of millions of dollars in overpayments from the inflated wage index by deliberately ignoring the obvious inflated level of the wage index, and consciously discouraging any investigation as to why the wage index was so high.

159. Phoebe executives have benefited from the falsely reported wage index through performance bonuses based in part on hospital "profits" or financial performance.

160. Phoebe had highly paid executives with high levels of expertise in Medicare reimbursement. Phoebe could afford the best consultants, qualified personnel, training and resources required to properly report their operations to Medicare as required by law. Every individual involved in the preparation of cost reports and the payroll data was a Certified Public Accountant.

161. In simple terms, the calculation of average hourly wage rate for a hospital may be generally and simply stated as: (wages paid + employee benefits) / total eligible worked hours paid. Accordingly, the wage index can be falsely increased by over-reporting payroll dollars, under-reporting worked hours, or overstating the amounts of certain employee benefits, or a combination of these methods.

162. Falsely underreporting hours worked was more likely than not the major factor in the falsely inflated average wage rate reported by Phoebe. Payroll dollars are a highly audited and reported number. Worked hours, on the other hand, are not subject to routine audit, nor are they routinely submitted to regulatory agencies or other outside scrutiny.

163. Worked hours are routinely used internally for budget purposes and voluntary peer group comparison reports, but these uses are not subject to routine audit examination. Thus, worked hours are an ideal candidate for manipulation, producing a major impact on the calculation, while having a low risk of detection.

44

164.    Payroll dollars are reported in the audited financial statements, quarterly and annual payroll tax returns, and retirement plan documents, among others. Thus, falsely reporting payroll dollars not actually paid would be problematic, and would face a high probability of discovery by various auditors and tax authorities. In addition, it would require payroll taxes to be paid on the phantom wages, which would reduce the overall gain of the scheme.

165.    Payroll dollars in the Medicare cost report are initially reported on Worksheet A, which must agree in amount to the salaries and wages reported in the hospital audited financial statements. Thus, to overstate payroll dollars, falsely overstated entries would have to be made on the books of the hospital, which would be subject to audit, and cause problems in the normal payroll tax reporting functions.

166.    The only manner to increase payroll dollars in the cost report without including them in the audited financial statements is by injecting them into the cost report via a Worksheet A-8 adjustment, or reclassify some other type of expense to wages via a Worksheet A-6 reclassification entry. It is well known by hospital accounting personnel that both Worksheets A-8 and A-6 are closely audited on every cost report, thus the likelihood of either of these methods going undetected is extremely low.

167.    It is also well know among hospital finance personnel that Worksheet S-3 statistics and other similar statistics are subject to very few Fiscal Intermediary ("FI") audit procedures. This is because Fiscal Intermediaries are under pressure to find and make adjustments that will affect the settlement amount of the cost

45

report under audit. Adjustments to Worksheet S-3 wage and hour data will have no effect upon the reimbursement of the year under audit; rather the effect is manifested four years later in the calculation of the wage index.

168.     Given the limited audit time available for any given cost report, fiscal intermediaries ("FI") concentrate on areas such as reimbursable Medicare bad debts and other risk areas with a high return in immediate adjustments for the audit effort expended. The likelihood of a FI audit discovering under-reported worked hours was thus low, and the scheme perpetrated by Phoebe was calculated to exploit that weakness in the Medicare audit procedures.

## THE ANONYMOUS LETTER WHICH TRIGGERED MR. REHBERG'S AND DR. BAGNATO'S INVESTIGATION

169.     In late August of 2004, Relator Charles Rehberg received correspondence from an anonymous employee or former employee of Phoebe which urged Relator Rehberg to "look at the Medicare Wage Index" for Phoebe and stated that Phoebe has filed "fraudulent Medicare Cost Reports and reaped $10's of millions in the last 4-5 years from it." That correspondence stated:

Mr. Rehberg,
I have watched and admired your willingness to put yourself on the line against Phoebe Putney. I work here and know it to be a very unethical place. This place has been grossly mismanaged, especially since Kerry Loudermilk has been here. Ed Ollie would have never advocated the type of behavior that he exemplifies. He is without     a doubt the worst manager that I've ever worked for. Anyway . . . enough about him . . . you are very much in the process of uncovering his shady dealings.

A couple of points to ponder. Why have we not filed our fiscal year ending 07/31/03 Form 990? I promise, that when we do, it will look much different than the FY02 report. There will be no addresses for Board members on it, for example. Instead of full disclosure, there will be minimal disclosure . . . at Kerry's

46

instruction.

Also, why don't you take a look at the Medicare Wage Index for the Albany MSA, composed primarily, of course, of PPMH wages. It's the highest in the state and there is a reason, and senior management knows it. We have filed fraudulent Medicare Cost Reports and reaped $10's of millions in the last 4-5 years from it.

If you will look at the 990's you'll recognize that they have transferred $10's of millions of investments from PPMH (in the public's eye) to PPHS (not for the public). This was a mere note to the financial statements.

We have been instructed to set our pricing at levels to maximize medicare outlier payments (see Tenet Health Systems).

You've only begun to peel back the onion. I wish that I could publically support you, but, I need my job!

There are, however, some upper management personnel that recently left our employment that may be willing to talk to you. If you'll do some investigation, you can quickly figure out who recently left the Finance Division.

A copy of this anonymous correspondence is attached to the original

Complaint as Exhibit "A."

## ANALYSIS OF THE COST REPORTS AND OTHER DATA CONFIRM PHOEBE PUTNEY'S FALSELY INFLATED WAGE INDEX

170.    A review of Phoebe's Medicare Cost Reports by Rehberg confirmed a

dramatic and incredible rise in the wage index reported by Phoebe. The rise in the

Albany wage index from .7975 in 1999 to 1.0372 in 2000 represents a 30 percent

increase in the wage index and a 21.3 percent increase in the DRG payment rate

for Phoebe. Between 1999 and 2000 when the increase occurred, DRG payments,

including outlier payments, to Phoebe increased from approximately $35.1

million to approximately $43.1 million.  The compounding effect on add-on

47

payments caused all Medicare inpatient payments to Phoebe to increase from approximately \$50.0 million to approximately \$62.3 million in one year.

171.    Dougherty and Lee County, Georgia compose an MSA which includes the City of Albany and only two hospitals: Phoebe Putney Memorial Hospital and Palmyra Medical Center. Below is a table of hourly wages reported over the past nine years in the Federal Register, including the weighted average and the weight of Phoebe in the calculation.

Table I

| Federal Fiscal Year | Phoebe | Palmyra | Weighted Average | Wage Index | Phoebe Weight[1] |
|------|---------|---------|---------|--------|--------|
| 1997 | 16.31 | 18.52 | 16.8101 | .8597 | 77.37% |
| 1998 | 15.29 | 18.54 | 15.9028 | .7914 | 81.14% |
| 1999 | 16.12 | 18.39 | 16.5708 | .7993 | 80.14% |
| 2000 | 23.4976 | 18.2016 | 21.9678 | 1.0372 | 71.11% |
| 2001 | 21.9505 | 20.4202 | 21.6247 | .9933 | 78.71% |
| 2002 | 25.2523 | 18.6637 | 23.7363 | 1.0640 | 76.99% |
| 2003 | 25.9135 | 20.1183 | 24.6091 | 1.0594 | 77.49% |
| 2004 | 28.2025 | 21.9411 | 26.8394 | 1.0819 | 78.23% |
| 2005 | 30.7430 | 25.5461 | 29.7283 | 1.1277 | 80.47% |

[1] Calculated based on the reported weighted average.

172.    Because of Phoebe's size relative to Palmyra, Phoebe has a significant influence, generally between 77 and 80 percent, on the wage index for the Albany, GA MSA or CBSA. Between 1998 and 2005, Phoebe's reported hourly wage rate approximately doubled. This occurred despite the fact that according to data from the Georgia Department of Labor, average wages in Dougherty County

48

and Albany are consistently ranked below comparable counties, metropolitan statistical areas, and the state-wide average.

173.    The change in the wage index reported by Phoebe has resulted in massive increases in federal payments. Based on the 2003 Cost Report submitted by Phoebe and after considering add-on payments for Indirect Medical Education and Disproportionate Share, the economic impact of each change in the wage index of .01 was approximately $603,541 in payments to Phoebe. For outpatient reimbursements, the economic impact of each change in the wage index of .01 was approximately $110,927.00 in payments to Phoebe.

174.    The precise correct wage index can be determined through an audit of the hospital's financial data with respect to all the variables which compose the wage index. The approximate range of the correct wage index can be estimated. For fiscal year 1999, PPMH's wage data led to an Albany MSA wage index of .7993. Assuming the accuracy of that wage index and assuming that the accurate Albany MSA wage index was actually .800 for subsequent fiscal years 2000, 2001, 2002, 2003, 2004, and 2005, then the false wage index data submitted by PPMH led to an estimated $75,695,903.00 (after the outlier offset) in federal overpayments.

175.    Because the wage index impacts reimbursement for every Medicare claim, a false wage index for a particular fiscal year means that every Medicare claim on behalf of the Hospital in that year is false. The estimated calculation of false inpatient claims multiplied by the minimum fine of $5,500.00 per claim is approximately $277,139,500.00 for the six-year period of Fiscal Years 2000 through 2005.

49

176.     In violation of 31 U.S.C. § 3729 and 42 U.S.C. 1320A-7b(a)(3), Defendants knowingly concealed the existence of discovered overpayments paid to them by Medicare, Medicaid, and TRICARE/CHAMPUS by maintaining silence about their own errors in order to retain the overpayments, by knowingly failing to amend their cost reports so as not to draw attention to false wage index data, and by taking affirmative steps to control and guard access to payroll data so that such overpayments would not be recognized and corrected.

177.     Defendants' false certifications of truthfulness, correctness, and accuracy damaged the Government because they caused the Phoebe Defendants to be paid inflated amounts based on the inflated wage index falsely reported by the Phoebe Defendants. Defendants' concealment of discovered overpayments damaged the Government because funds improperly paid were not recovered. Defendants' actions damaged the integrity of the Medicare program because funds which should have been available to other hospitals were wrongfully diverted to and retained by Phoebe.

178.     The False Claims Act has a liberal scienter requirement. "No proof of specific intent to defraud is required" to state a claim under the FCA. 31 U.S.C. § 3927(b). Additionally, under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b), Fed. R. Civ. P.

179.     A plaintiff is not required to plead fraud in a False Claims Act action, rather, only that the conduct by the defendants was done knowingly. Liability under the Civil False Claims Act is statutory--that is liability arises from performance of one of the acts set forth in 31 U.S.C. § 3729(a). This statutory

50

liability underscores that the False Claims Act is not a fraud statute; instead it is a false claim/false statement statute.

180.    The FCA establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly_makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2), or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (emphasis added). The FCA defines "knowing" and "knowingly" as having actual knowledge of the information, or acting in either deliberate ignorance of or in reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b).

181.    Fraudulent intent needs neither to be pled nor proven for a plaintiff to state a claim under the FCA.

182.    Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the accuracy of information or investigate the accuracy of

information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

183.    A case under the FCA must be proven by a preponderance of the evidence.

184.    More probably than not, at a minimum, the Phoebe Defendants failed to apply basic and fundamental accounting measures to verify and evaluate the accuracy of the wage index information submitted to the United States government and failed and refused to investigate the accuracy of such information when on notice of questions concerning the accuracy of such information. The Phoebe Defendants acted in reckless disregard or deliberate ignorance sufficient to charge them with knowledge of the falsity of the claims in question.

## FIRST CAUSE OF ACTION
### False Claims Act; Presentation of False Claims 31 U.S.C. § 3729(a)(1)

185.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

186.    Phoebe falsely manipulated its wage index data and knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Phoebe Putney also presented or caused to be presented false or fraudulent claims for payment to the Indigent Care Trust Fund.

187.    By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## SECOND CAUSE OF ACTION

52

## False Claims Act: Making Or Using False Record Or Statement
## To Cause Claim to be Paid
## (31 U.S.C. §3729(a)(2))

188. Plaintiffs repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

189. Phoebe knowingly made, used, or caused to be made or used false records or statements – i.e., the false certification and representations made or caused to be made by Phoebe when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Phoebe in submitting the cost reports – to get false and fraudulent claims paid or approved by the United States.

190. By virtue of the false records or false statements made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## THIRD CAUSE OF ACTION

## False Claims Act; Conspiring to Submit False Claims
## (31 U.S.C. §3729(a)(3)

191. Plaintiffs repeat and reallege the foregoing Paragraphs as though fully set forth herein.

192. Phoebe and the John Doe Defendants conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3). As part of schemes and agreements to obtain reimbursements from the United States in violation of federal laws, these Defendants conspired together

53

to receive illegal remunerations based on false wage index data.

193.       By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## FOURTH CAUSE OF ACTION

### Payment By Mistake of Fact

194.       Plaintiffs repeat and reallege the foregoing Paragraphs as though fully set forth herein.

195.       This is a claim for the recovery of monies paid by the United States to Phoebe as a result of mistaken understandings of fact.

196.       The false claims which Phoebe submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

197.       The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Phoebe certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

198.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

199.     This is a claim for the recovery of monies by which Phoebe has been unjustly enriched.

200.     By directly or indirectly obtaining Government funds to which they were not entitled, Phoebe was unjustly enriched, and are liable to account and pay with amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION

### Disgorgement Of Illegal Profit, For Imposition Of A Constructive Trust And An Accounting

201.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

202.     This is a claim for disgorgement of profits received by Phoebe because of illegal payments obtained by Phoebe under false and fraudulent wage index data submitted by Phoebe.

203.     Phoebe concealed its illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States.

204.     The United States did not detect Phoebe's illegal conduct.

205.     This Court has the equitable power to, among other things, order Phoebe to disgorge the entire profit they earned from business generated as a result of

their violations of the False Claims Act.

## SEVENTH CAUSE OF ACTION

### Recoupment of Overpayments

206.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

207.    This is a claim for recoupment for the recovery of monies unlawfully paid by the United States to Phoebe contrary to statute or regulation.

208.    The United States paid Phoebe certain sums of money to which they were not entitled, and Defendants are thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## EIGHTH CAUSE OF ACTION

### Common Law Fraud

209.    Plaintiffs repeat and reallege the foregoing Paragraphs if fully set forth herein.

210.    Phoebe made material and false representations in their initial requests for interim payments and in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon Phoebe's misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

56

211.    Had the true facts been known to the United States, Phoebe would not have received the interim payments or the inflated amounts on the cost reports.

212.    By reason of these interim payments and the inflated amounts on the cost reports, the United States has been damaged in as yet undetermined amount.

## NINTH CAUSE OF ACTION

### Violation of 31 USC § 3729(a)(7) Reverse False Claims

213.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

214.    Defendants knowingly and consciously manipulated the wage index data by inflating that data in order to obtain greater reimbursement.

215.    Defendants have consistently created false records or statements, in the form of cost reports and other documentation regarding wage index data.

216.    Defendants are aware that they have been overpaid on Medicare and Medicaid admissions since at least 2000 and that they are obligated to repay those overpayments to the federal government.

217.    Defendants have continued to create false records in order to avoid, conceal, decrease, or diminish its obligation to repay the Medicare program for wrongful payments based on the inflated wage index.

218.    As such it is liable to the government for three times the amount of the over-payments.

219.    Defendants are also liable for a civil penalty attaching to all claims for reimbursement made between 1997 and 2004 in an amount no less than $5,500 nor more than $11,000 per claim.

## TENTH CAUSE OF ACTION

### Submission Of False Claims In Violation Of 31 USC § 3729(a)(1)

220. Plaintiffs repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

221. Because PPMH must certify its compliance with all applicable Medicare and Medicaid regulations as a condition of payment under the Prospective Payment System, the false certification of compliance, which has been willfully and knowingly done, constitutes a false claim under 31 USC § 3729.

222. By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## ELEVENTH CAUSE OF ACTION

### Creation Of False Records 31 USC § 3729(a)2 (PPMH)

223. Plaintiffs repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

224. By allowing its CRNA staff to be used by Albany Anesthesia in violation of federal law and regulation, CRNA staff are not being used or paid for a lawful purpose and their salaries and the costs associated with them are not properly part of the Medicare Cost Report.

225. In submitting Medicare Cost Reports to Medicare claiming the salary and benefit costs of CRNAs that are the private leased employees of Albany Anesthesia and over whom PPMH does not maintain supervisory control,

58

defendant PPMH has engaged in the creation of false records in support of false claims.

226.    By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## TWELFTH CAUSE OF ACTION

### Reverse False Claims In Violation of 31 USC § 3729(a)7

227.    Plaintiffs repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

228.    Once the wrongful arrangement of Anesthesia services was called to the attention of the Chief Financial Officer, Loudermilk, PPMH knew that it was in an unlawful arrangement for the provision of anesthesia services.

229.    After being informed of the unlawful arrangement by Moree, CFO Loudermilk directed Moree to stop pursuing the matter.

230.    In the normal course of business after finding that it was paying for employees who were being used by a separate entity, and that the separate entity was recovering the costs associated with those employees without reimbursement to the facility, reporting and accounting entries reflecting the charge offs should have been made in the normal course of business.

231.    By refusing to allow Moree to continue to investigate and make those record entries, Loudermilk created a false record to avoid, decrease, or eliminate an obligation to repay money to the United States.

232.    By virtue of the false or fraudulent claims made by Phoebe, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYERS FOR RELIEF

233.    WHEREFORE, on behalf of the United Stats, Plaintiffs demand and pray that judgment against Defendants, jointly and severally, as follows:

234.    On the First, Second, Third, Ninth, Tenth, Eleventh, and Twelfth Causes of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, for a qui tam relators share as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

235.    On the Fourth, Fifth and Seventh Causes of Action, for payment by mistake, unjust enrichment, and recoupment, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be

60

just and proper.

236. On the Sixth Cause of Action for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Defendants and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further and equitable relief as may be just and proper.

237. On the Eighth Cause of Action for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

## JURY TRIAL IS HEREBY DEMANDED.

Respectfully submitted, this the $\mathcal{9}^{TH}$ day of October, 2007.

VROON & CRONGEYER, LLP

BY:
Bryan A. Vroon w/express permission
Georgia Bar No. 729086

BY:
John W. Crongeyer w/express permission
Georgia Bar No. 197267

1718 Peachtree Street, Suite 1088
Atlanta, Georgia 30309

61

Telephone: (404) 607-6710
Facsimile: (404) 607-6711

**BROWN & SCOCCIMARO, P.C.**

BY:
Jimmie H. Brown
Georgia Bar No. 088134

BY:
Ralph Scoccimaro / expens permissi
Georgia Bar No. 631525

P.O. Box 1646
Albany, Georgia 31702
Telephone: (229) 432-9310
Facsimile: (229) 436-6302

Edward D. Robertson, Jr.
Missouri Bar No. 27183
Anthony L. DeWitt
Missouri Bar No. 41612
Bartimus, Frickleton, Robertson & Obetz, PC
715 Swifts Highway
Jefferson City, MO 65109
Telephone: (573) 659-4454
Facsimile: (573) 659-4460

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. rel., | ) |
| CHARLES REHBERG, JOHN BAGNATO, M.D. | ) |
| and ALAN MOREE | ) Civil Action No.: 1:04-CV-162 (WLS) |
| | ) |
|     Relators/Quitam Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| PHOEBE PUTNEY HEALTH SYSTEMS, INC.; | ) **TO BE FILED IN CAMERA** |
| PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.; | ) **AND UNDER SEAL** |
| LAMAR MOREE, M.D.; ALBANY ANESTHESIA, | ) |
| JOHN DOES 1 THROUGH 100, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing

**Second Amended Quitam Relator Complaint Under 31 U.S.C. §3729, Federal False**

**Claims Act** by depositing a true and correct copy of same by **Certified Mail** in the

United States Mail, postage prepaid, addressed as follows:

> Peter Keisler
> Maxwell Wood
> Michael F. Hertz
> Daniel Anderson
> Marie V. Bonkowski
> Attorneys, Civil Division
> U.S. Department of Justice
> P.O. Box 261 Ben Franklin Station
> Washington, D.C. 20044

This ____ day of October, 2007.

_____
Bryan A. Vroon